Colt v New Jersey Tr. Corp. (2024 NY Slip Op 05867)

Colt v New Jersey Tr. Corp.

2024 NY Slip Op 05867

Decided on November 25, 2024

Court of Appeals

Singas

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on November 25, 2024

No. 72 

[*1]Jeffrey Colt et al., Respondents,
v
New Jersey Transit Corporation, et al., Appellants.

Katherine L. Pringle, for appellants.
Brian J. Shoot, for respondents.
New York State Trial Lawyers Association, amicus curiae.

SINGAS, J.

In Franchise Tax Bd. of Cal. v Hyatt, the United States Supreme Court recognized that the text and structure of the Federal Constitution not only preserved States' pre-ratification sovereign immunity, but compelled absolute recognition of that immunity in other States' courts as a matter of "equal dignity and sovereignty" (587 US 230, 244-247 [2019] [hereinafter Hyatt III], overruling Nevada v Hall, 440 US 410 [1979]). However, the Court did not address how to determine whether a state-created entity is entitled to this immunity. We glean from the Court's analysis that the relevant inquiry is whether subjecting a state-created entity to suit in New York would offend that State's dignity as a sovereign. We hold that, to answer this question, courts must analyze how the State defines the entity and its functions, its power to direct the entity's conduct, and the effect on the State of a judgment against the entity. Considering these factors, we conclude that maintaining this action against defendant New Jersey Transit Corporation (NJT) in our courts would not offend New Jersey's sovereign dignity and accordingly hold that defendants are not entitled to invoke a sovereign immunity defense.
I.
On February 9, 2017, a bus owned and operated by NJT allegedly struck and injured plaintiff Jeffrey Colt as he traversed a crosswalk on 40th Street in Manhattan. The bus was driven by defendant Ana Hernandez, an employee [*2]of NJT. Colt and his wife, plaintiff Betsy Tsai, commenced this action on September 18, 2017, asserting causes of action for negligence, negligent hiring, and loss of consortium. Defendants answered the complaint and denied many of plaintiffs' factual allegations. Defendants asserted—as part of an exhaustive list including many boilerplate defenses—that plaintiffs' recovery was "barred by lack of jurisdiction over NJT" and "barred as this Court lacks jurisdiction," and that defendants were "immune from suit." Defendants did not specifically reference sovereign immunity. In 2018, plaintiffs filed a bill of particulars, and defendants deposed Colt. In 2019, plaintiffs deposed Hernandez and another NJT employee who was on the bus at the time of the accident. The parties had status conferences and stipulated to scheduling orders six times during that period. In November 2019, defendants moved to compel discovery and subsequently stipulated to three more scheduling orders.
On July 15, 2020, defendants moved to dismiss the complaint. Relying on Hyatt III—decided 14 months prior—defendants argued that NJT is "the alter ego of New Jersey" and therefore protected by sovereign immunity. In support of its argument that NJT was an "arm of the state" entitled to invoke sovereign immunity, defendants cited a decision by the United States Court of Appeals for the Third Circuit holding that NJT is entitled to invoke sovereign immunity in federal court (see Karns v Shanahan, 879 F3d 504, 519 [3d Cir 2018]). Defendants contended that NJT's immunity extended to defendant New Jersey Transit Bus Operations, Inc., as a wholly owned subsidiary of NJT, and to Hernandez because she was acting within the scope of her employment with NJT. Defendants argued that their sovereign immunity defense could be raised at any time because it was jurisdictional and therefore could not be waived. Plaintiffs opposed the motion and asserted several grounds on which NJT waived any immunity it possessed.
On October 2, 2020, Supreme Court denied defendants' motion (2020 NY Slip Op 33260[U] [Sup Ct, NY County 2020]). The court held that, by waiting three years from the inception of the action to raise a jurisdictionally based objection, defendants had waived their right to assert a sovereign immunity defense (id. at *3-4). Defendants appealed.
The Appellate Division affirmed in a split decision (206 AD3d 126 [1st Dept 2022]). The Court concluded that NJT did not waive its sovereign immunity defense. At the outset, the Court noted that it had previously held that NJT was an arm of the State of New Jersey and thus entitled to invoke sovereign immunity (id. at 128, citing Fetahu v New Jersey Tr. Corp., 197 AD3d 1065, 1065 [1st Dept 2021]). The Court further concluded that, contrary to Supreme Court's holding, defendants had not waived this immunity through their litigation conduct, or otherwise (id. at 129).
The Court nonetheless affirmed because dismissal would be "an affront to our sense of justice and cannot be countenanced" (id. at 133). In reaching this conclusion it considered whether plaintiffs would have been able to bring their suit in New Jersey under the New Jersey Tort Claims Act (NJTCA). Reviewing New Jersey's venue rules, the Court concluded that "plaintiffs cannot commence an action in New Jersey because the cause of action arose outside its borders" (id. at 130). Thus, the Court concluded that there was an issue "pitting the sovereign immunity defense against an individual's fundamental right derived from the common law to be able to seek redress in a judicial forum for injuries inflicted by a tortfeasor" (id. at 132). Resolving this issue by analogy to the forum non conveniens doctrine, the Court concluded that these factors weighed in favor of retaining the action, reasoning that NJT would not be prejudiced by allowing the suit to proceed, given that it waited three years to move to dismiss, would not be burdened by defending the action in New York, where all of the material witnesses and evidence were located, and plaintiffs would not be able to sue in New Jersey's courts (id. at 133).
Two Justices dissented, contending that the Court's inquiry should be limited to whether defendants could assert a sovereign immunity defense and whether they had waived that defense (id. at 136 [Friedman, J., dissenting]). On those questions, the dissent agreed that NJT was an arm of the State of New Jersey, and that neither the NJTCA nor defendants' litigation conduct had waived the sovereign immunity defense (id.). The dissent disagreed that plaintiffs' inability to file suit in New Jersey had any relevance to the sovereign immunity analysis because no legal authority requires States to waive their sovereign immunity under any circumstances (id. at 138-139).
Defendants appealed, but we dismissed the appeal for lack of finality (see 39 NY3d 954 [2022]). The Appellate Division granted defendants leave to appeal and certified the question of whether its order was properly made (see 2023 NY Slip Op 64078[U] [1st Dept 2023]). We now affirm, albeit on different grounds.
II.
Hyatt III fundamentally altered the landscape of interstate sovereign immunity. Overturning Nevada v Hall, the Court "clarif[ied] that all state sovereign immunity derives from the structure of the Constitution which confirmed and retained pre-ratification notions of state sovereign immunity 'except as altered by the plan of the Convention or certain constitutional Amendments' " (Henry v New Jersey Tr. Corp., 39 NY3d 361, 370 [2023] [some internal [*3]quotation marks omitted], quoting Hyatt III, 587 US at 241). Under Hall, the Supreme Court had looked to "international-law notions of immunity," which treated the "decision for one State to extend immunity to another State in its own courts [ ]as a matter of comity for the forum State to decide" (id. at 369, citing Hall, 440 US at 421, 425). Hyatt III abrogated this aspect of Hall, concluding instead that as an "essential component of federalism," by entering the Union, the States, which had previously "relate[d] to each other solely as foreign sovereigns" were "strip[ped] . . . of any power they once had to refuse each other sovereign immunity" under international law (Hyatt III, 587 US at 245, 247 [internal quotation marks omitted]). In other respects, however, the Court concluded that the States maintained their pre-ratification immunity "under both the common law and the law of nations" (id. at 241).
Because interstate sovereign immunity was a matter of comity before Hyatt III—constrained by the Federal Constitution's Full Faith and Credit Clause—few decisions explored which parties, other than a State itself, are entitled to invoke sovereign immunity in another State's courts. Wading into these uncharted waters, we look for guidance in the Court's opinion in Hyatt III as well as the related jurisprudence of state sovereign immunity in federal courts. As we explained in Henry, the Supreme Court in Hyatt III noted that
"[s]overeign immunity derives from the common-law premise that 'no suit or action can be brought against the king, even in civil matters, because no court can have jurisdiction over him' (1 William Blackstone, Commentaries on the Laws of England at 235 [1765]; see Hyatt III, 587 US at [238-239]; see also Glassman v Glassman, 309 NY 436, 440 [1956]). Because 'all jurisdiction implies superiority of power,' no authority could hear a case 'unless that court had power to command the execution of it; but who . . . shall command the king?' (1 Blackstone at 235). . . . Sovereign immunity also emanates from the conceit of 'the perfect equality and absolute independence of sovereigns under . . . international law' (Hyatt III, 587 US at [239] [internal quotation marks omitted])" (Henry, 39 NY3d at 368; see also Beers v Arkansas, 20 How [61 US] 527, 529 [1857]; The Antelope, 10 Wheat [23 US] 66, 122 [1825]).
Before ratification, the States—as foreign sovereigns—recognized each other's dignity by affording immunity in their own courts as a matter of comity (see Hyatt III, 587 US at 244-245). But when the States' discretion was removed, their obligation to respect each other's sovereign dignity in their own courts became absolute (see id. at 245). Thus, in exploring the limits of a state-created entity's sovereign immunity in our courts, our basic task is to determine whether allowing the suit to proceed under the circumstances would offend our sister State's "equal dignity and sovereignty under the Constitution" (id.).
Our analysis aligns with the framework many courts apply in analyzing whether a state-created entity may invoke sovereign immunity in federal court—often called "Eleventh Amendment immunity"[FN1]—which is rooted in the same pre-ratification notions of State dignity (see Federal Maritime Comm'n v South Carolina Ports Authority, 535 US 743, 760 [2002] ["The preeminent purpose of state sovereign immunity is to accord States the dignity that is consistent with their status as sovereign entities"]; Seminole Tribe of Fla. v Florida, 517 US 44, 58 [1996] [sovereign immunity "serves to avoid the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties" (internal quotation marks omitted)]; Hess v Port Authority Trans-Hudson Corporation, 513 US 30, 47 [1994] [analyzing whether suit in federal court was a "threat to the dignity" of the State]). While the text of the Eleventh Amendment applies only to federal courts, the Supreme Court has explained that it "stand[s] not so much for what it says, but for the presupposition of our constitutional structure which it confirms: that the States entered the federal system with their sovereignty intact . . . [and] that the [federal] judicial authority . . . is limited by this sovereignty" (Blatchford v Native Village of Noatak, 501 US 775 [1991]). It is these same principles that underpinned the Court's rejection of Hall in Hyatt III. Indeed, in Hyatt III, the Court reaffirmed that the Eleventh Amendment "reflect[ed]" and reaffirmed existing state sovereign immunity, rather than establishing a new "source of sovereign immunity" that limits only the jurisdiction of the federal courts (Hyatt III, 587 US at 241, 247; see also [*4]Virginia Office for Protection and Advocacy v Stewart, 563 US 247, 253 [2011] [the Eleventh Amendment reflects "the structural understanding that States entered the Union with their sovereign immunity intact"]). The Supreme Court has rejected the idea that the Eleventh Amendment represents an independent limitation on federal courts' subject matter jurisdiction over suits involving States (see Federal Maritime Comm'n, 535 US at 753 ["the Eleventh Amendment does not define the scope of the States' sovereign immunity; it is but one particular exemplification of that immunity"]; compare PennEast Pipeline Co. v New Jersey, 594 US 482, 506 [2021] [rejecting dissenting opinion's assertion that the Eleventh Amendment imposes an independent jurisdictional limitation], with id. at 510-512 [Gorsuch, J., dissenting] [arguing that the Eleventh Amendment both confirms pre-ratification structural immunity and eliminates federal judicial power in certain cases]).[FN2] Because States' sovereign immunity in federal and state courts are analytically and historically intertwined, we deem it appropriate to conduct our analysis consistent with the Supreme Court's and other federal court's arm-of-the-state jurisprudence.
The Supreme Court has explained that "when the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit" (Ford Motor Co. v Department of Treasury of Ind., 323 US 459, 464 [1945]). In assessing whether a state-created entity is a so-called "arm of the state," the Supreme Court has looked to the " 'the essential nature and effect of the proceeding' " (see Regents of Univ. of Cal. v Doe, 519 US 425, 429 [1997], quoting Ford Motor Co., 323 US at 464) and the " 'nature of the entity created by state law' " (id., quoting Mt. Healthy City Bd. of Ed. v Doyle, 429 US 274, 280 [1977]). The Court has considered the degree of the State's control over the entity, how state law characterizes the entity, whether the entity performs traditional state governmental functions, and whether the State would be liable, or financially responsible, for a judgment against the entity (see Hess, 513 US at 44-45; Lake Country Estates, Inc. v Tahoe Regional Planning Agency, 440 US 391, 400-401 [1979]; Mt. Healthy City Bd. of Ed., 429 US at 280; Moor v County of Alameda, 411 US 693, 717-721 [1973]).[FN3] The Court has also analyzed whether there is evidence that the State structured the entity "to enable it to enjoy
the special constitutional protection of the States themselves" (Lake Country Estates, Inc., 440 US at 401).
Federal Circuit Courts have identified more specific considerations in an array of multifactor and multistep tests (see e.g. Fresenius Med. Care Cardiovascular Resources, Inc. v Puerto Rico & the Caribbean Cardiovascular Ctr. Corp., 322 F3d 56, 68-75 [1st Cir 2003]; Mancuso v New York State Thruway Auth., 86 F3d 289, 293-297 [2d Cir 1996]; Karns, 879 F3d at 513-519; Hutto v South Carolina Retirement Sys., 773 F3d 536, 543-548 [4th Cir 2014]; Clark v Tarrant County, 798 F2d 736, 744-745 [5th Cir 1986]; Ernst v Rising, 427 F3d 351, 359-361 [6th Cir 2006]; DuPage Regional Off. of Educ. v United States Dept. of Educ., 58 F4th 326, 341-350 [7th Cir 2023]; United States ex rel. Fields v Bi-State Dev. Agency of Mo.-Ill. Metro. Dist., 872 F3d 872, 877-883 [8th Cir 2017]; Kohn v State Bar of Cal., 87 F4th 1021, 1025-1032 [9th Cir 2023]; Hennessey v University of Kan. Hosp. Auth., 53 F4th 516, 528-542 [10th Cir 2022]; Manders v Lee, 338 F3d 1304, 1308-1328 [11th Cir 2003]; Puerto Rico Ports Auth. v Federal Maritime Commn., 531 F3d 868, 873-881 [DC Cir 2008]).[FN4] Indeed,
"courts take numerous factors into consideration, including the statute creating the particular agency, whether the defendant has state-court immunity, decisions by the state courts, and decisions involving such agencies in other states. Also important are the powers of the agency vis-a-vis the state—for example, its powers to contract, to sue or be sued, to raise revenue, and to expend funds. In the final analysis, central factors appear to be the degree of autonomy of the defendant and whether recovery against it will come from state funds; if the unit or individual is simply functioning as the alter ego of the state in accomplishing some public purpose, it will be treated as the state and entitled to immunity" (13 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3524.2 [3d ed, June 2024 update] [footnote omitted]).
Many Federal Circuit Courts look to the State's dignity as a foundational principle in analyzing arm-of-the-state status (see e.g. Mancuso, 86 F3d at 296 ["the sole question remaining is whether suit in federal court will be an affront to the dignity of New York State"]; Hutto, 773 F3d at 546 [analyzing factors to determine "whether allowing suit against a state entity would offend a State's dignity"]). The Supreme Court has not yet endorsed any particular Circuit's formulation of the arm-of-the-state test.
III.
We distill from Hyatt III and other federal cases the following factors, adapted to our current use in the interstate sovereign immunity context. In considering whether a foreign state-created entity is entitled to sovereign immunity in New York, courts should consider: (1) how the State defines the entity and its functions, (2) the State's power to direct the entity's conduct, and (3) the effect on the State of a judgment against the entity. Courts need not give equal weight to each consideration, and the underlying indicia may vary by case and from one party to another. We do not find it necessary to list more specific subfactors that might not be relevant to all cases. Rather, we analyze each consideration with the fundamental goal of determining whether allowing a suit against the foreign state-created entity to proceed in our courts would offend our sister State's dignity. Applying these principles to the present case, we conclude that NJT does not enjoy New Jersey's sovereign immunity.
A.
First, to determine whether the entity is an extension of the State and its powers, we examine how the State defines the entity and its functions. Initially, the State's own characterization of NJT conflicts somewhat as to whether it envisions NJT as a separate corporation serving the public or an extension of the State. The New Jersey Legislature created NJT to "establish and provide for the operation and improvement of a coherent public transportation system" (NJ Stat § 27:25-2 [b]), deeming the "provision of efficient, coordinated, safe and responsive public transportation" to be "an essential public purpose which promotes mobility, serves the needs of the transit dependent, fosters commerce, conserves limited energy resources, protects the environment and promotes sound land use and the revitalization of our urban centers" (id. § 27:25-2 [a]). Though New Jersey law gives NJT a separate corporate existence, it classifies NJT as a department within New Jersey's Executive Branch, specifically its Department of Transportation (id. § 27:25-4 [a]). It also characterizes NJT as "an instrumentality of the State exercising public and essential governmental functions" (id. § 27:25-4 [a]). NJT has the power to sue and be sued (id. § 27:25-5 [a]). Though New Jersey law prohibits NJT from asserting sovereign immunity in certain actions based on federal law, in doing so, it appears to take no position on whether NJT is entitled to sovereign immunity in the first instance (see id. § 27:25-24.2 ["if such defense is found to be available, the defense shall be waived"]).
Nonetheless, some state cases describe NJT as a state agency (see e.g. New Jersey Tr. PBA Local 304 v New Jersey Tr. Corp., 290 NJ Super 406, 408, 675 A2d 1180, 1181 [App Div 1996] [NJT "is a state agency responsible for operating and improving public transportation in New Jersey"]). Moreover, the New Jersey Supreme Court has held that "NJT is a public entity within the ambit of the [NJ]TCA" notwithstanding that NJT is not included within that law's definition of a "State" (Muhammad v New Jersey Tr., 176 NJ 185, 194, 821 A2d 1148, 1153 [2003]). However, [*5]this carries less weight in our analysis, given that the NJTCA expansively includes many entities that would not be considered arms of the state for sovereign immunity purposes (see NJ Stat § 59:1-3). We must also take into account that NJT may pass rules and regulations with the "force and effect of law" in accordance with the New Jersey Administrative Procedure Act (id. § 27:25-5 [e]). And it is not required to pay state taxes (id. § 27:25-16).
Additionally, it is debatable whether operating an intrastate and interstate transportation network is a traditional state governmental function given the myriad other non-state public and private entities that provide similar services (see Hess, 513 US at 45). Though, NJT's unique status provides few analogues.[FN5]
On balance, we conclude that this factor leans toward according NJT sovereign immunity.
B.
The second factor asks whether the State directs the entity's conduct such that the entity acts at the State's behest. NJT exercises significant independence from New Jersey's control. "Notwithstanding" its classification under the Department of Transportation's umbrella, NJT is "independent of any supervision or control by the department or by any body or officer thereof" (NJ Stat § 27:25-4 [a]). In fulfilling their duties, NJT's board members must exercise their "independent judgment in the best interest of [NJT], its mission, and the public" (id. § 27:25-4.1 [b]). New Jersey's government does not direct the day-to-day operations of NJT. Rather, in directing its own operations, NJT has the power to, among other things, "make and alter bylaws for its organization and internal management and for the conduct of its affairs and business," transact in real and personal property and collect revenues for its operations, set fares and collect fare revenue for its operations, and enter into agreements and contracts (id. § 27:25-5 [c], [j], [k], [n], [o], [v]).
On the other hand, NJT remains beholden to the State in some respects. The members of NJT's board are appointed by the Governor, either for that office, or by virtue of their appointment as members of the Executive Branch, though they may be removed only for cause (id. § 27:25-4 [b]). The Commissioner of Transportation, an executive branch official who is the chairman of NJT's governing board, reviews NJT's expenditures and budget (id. § 27:25-20 [a]). NJT must annually report its budget and condition to New Jersey's Commissioner of Transportation, its Governor, and its Legislature (id. § 27:25-20 [a]-[b]). The Governor has veto authority over official actions taken by the board, and the legislature can overrule a limited number of transactions (id. §§ 27:25-4 [f]; 27:25-13 [h]). Thus, while NJT maintains the broad authority to conduct its business without the State's authorization, the Governor maintains the ability to influence its operations through their exercise of appointment and veto powers. Therefore, this factor does not weigh heavily in either direction.
C.
The final factor assesses whether the entity's liability is the State's liability, such that a judgment against the entity would be an affront to the State. Regarding the legal effect of a judgment against NJT, New Jersey law provides:
"All expenses incurred by [NJT] in carrying out the previsions of this act shall be payable from funds available to [NJT] therefor and no liability or obligation shall be incurred by the corporation beyond the extent to which moneys are available. No debt or liability of [NJT] shall be deemed or construed to create or constitute a debt, liability, or loan or pledge of the credit of the State" (id. § 27:25-17).
The State has thus clearly disclaimed any legal liability for judgments against NJT, counseling against treating NJT as an arm of New Jersey. Additionally, defendants have not established that New Jersey would bear ultimate liability for a judgment against NJT.
Balancing each consideration, we conclude that New Jersey's lack of legal liability or ultimate financial responsibility for a judgment in this case outweighs the relatively weak support provided by the other factors. Put [*6]simply, allowing this suit to proceed would not be an affront to New Jersey's dignity because a judgment would not be imposed against the State, and the entity that would bear legal liability has a significant degree of autonomy from the State.[FN6] We therefore conclude that NJT is not an arm of New Jersey and may not invoke sovereign immunity.[FN7] The remaining defendants' claims of sovereign immunity also fail, because these claims depend on NJT's status as an arm of New Jersey.
IV.
Given our holding that NJT is not entitled to invoke sovereign immunity, we need not reach plaintiffs' arguments that defendants waived any such immunity. However, to avoid any misimpression that we endorse the Appellate Division's reasoning on that score, we make clear that we expressly reject it. Regardless of whether the Appellate Division was correct that plaintiffs were unable to bring their action in New Jersey's courts, interstate sovereign immunity is not, as the Appellate Division theorized, founded on the equitable principles that motivate the forum non conveniens doctrine. Inherent in the nature of sovereign immunity is the possibility that a State may avoid liability for a wrong it has done. Our courts may not disregard a sister State's sovereignty simply because an individual might otherwise not be able to recover a judgment against it. We agree with the dissent that this theory would render sovereign immunity and Hyatt III "dead letters" (206 AD3d at 135 [Friedman, J., dissenting]).
Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.

HALLIGAN, J. (concurring):

The majority aptly says that Franchise Tax Board of California v Hyatt (587 US 230 [2019] [Hyatt III]) leaves us in "uncharted waters" on the question before us: when a party other than the State itself may invoke sovereign immunity to block a private lawsuit commenced in another State's courts (majority op at 6). I agree that New Jersey [*7]Transit (NJT) cannot invoke sovereign immunity here, but write separately to address several points made by the majority and the concurrence.
I. The majority holds that "the relevant inquiry is whether subjecting a state-created entity to suit in New York would offend that State's dignity as a sovereign" (majority op at 2). This reliance on "dignity" raises more questions than it answers.
First, why is "dignity" the relevant touchstone for questions of interstate sovereign immunity? The majority draws an inference based on Nevada v Hall (440 US 410 [1979]) (see majority op at 5-7), but the continued force of Hall's analytical framework and historical grounding is at best dubious after Hyatt III. Indeed, the United States Supreme Court in Hyatt III explicitly told us that "Hall's determination that the Constitution does not contemplate sovereign immunity for each State in a sister State's courts misreads the historical record and misapprehends the 'implicit ordering of relationships within the federal system' " (587 US at 237, quoting Hall, 440 US at 433 [Rehnquist, J., dissenting]).
Second, what does it mean to "offend [a] State's dignity" (majority op at 2)? The majority has no answer: it merely asserts that its inquiry "aligns" with Eleventh Amendment jurisprudence (id. at 7), and then announces another version of the "arm of the State" test (see id. at 11-12). To be sure, the Supreme Court's case law on state sovereign immunity, though extensive, says little more about the concept than does the majority. Perhaps its clearest articulation came over a century ago in Ex parte Ayers, where the Court declared that "[t]he very object and purpose of the eleventh amendment were to prevent the indignity of subjecting a state to the coercive process of judicial tribunals at the instance of private parties" (123 US 443, 505 [1887]). It would "be neither becoming nor convenient," the Court said, "that the course of [the States'] public policy and the administration of their public affairs should be subject to and controlled by the mandates of judicial tribunals, without their consent, and in favor of individual interests" (id.). None of the Court's more recent decisions give any more detail, and so, based on this fleeting explanation, the best one can say is that a concern for State dignity reflects a reluctance to allow a non-consenting State to be haled into court and its policy decisions subjected to judicial dictates (cf. Hyatt III, 587 US at 247 [noting that "a State's assertion of compulsory judicial process over another State involves a direct conflict between sovereigns"]).
Third, what does the notion of dignity tell us about whether an entity other than a State itself may invoke sovereign immunity? Hall gave a clear answer: the "source" of interstate sovereign immunity "must be found either in an agreement, express or implied, between the two sovereigns, or in the voluntary decision of the second to respect the dignity of the first as a matter of comity" (440 US at 416). Thus, for the forty years that Hall was good law, the States presumably were free to determine as a matter of comity when a non-state entity was sufficiently akin to the State itself to invoke sovereign immunity. But Hyatt III overruled Hall, and even though Hyatt had sued a non-state entity, the Court was silent about why an entity other than a State itself could immunize itself from a private suit in another State's courts. The majority offers no clear connection between dignity and the
question of immunity either, eliding its leap from Hyatt III's discussion of dignity to a reliance on Eleventh Amendment jurisprudence (see majority op at 6-9). It is therefore understandable that our dissenting colleague has concluded that a concern for state solvency, rather than dignity, drives the majority's analysis (see dissenting op at 2).
In short, I am skeptical that this nebulous concept of State dignity is useful in determining what types of non-state entities may invoke sovereign immunity. It is one thing to say that "[t]he preeminent purpose of state sovereign immunity is to accord States the dignity that is consistent with their status as sovereign entities" (Federal Maritime Comm'n v South Carolina State Ports Authority, 535 US 743, 760 [2002]). It is another task altogether to determine whether, and in what circumstances, a private suit against a non-state entity is "an impermissible affront to a State's dignity" (id.).
That said, I agree with the majority that the "arm of the State" doctrine developed in Eleventh Amendment litigation is a useful reference point. The Court's approach to when a non-state entity can invoke immunity has evolved over the years. Early decisions denied immunity to a state-created corporate entity that had "the capacity to [*8]sue and be sued" (see e.g. Bank of United States v Planters' Bank of Ga., 9 Wheat [22 US] 904, 907 [1824])[FN8]. That gave way to the "arm of the State" test by the mid-twentieth century (see Mt. Healthy City Bd of Ed. v Doyle, 429 US 274, 279-281 [1977]; see also Hess v Port Authority Trans-Hudson Corporation, 513 US 30, 42-43 [1994]; Regents of Univ. of Cal. v Doe, 519 US 425, 429 [1997]). The factors encompassed in this test go to the crux of what a sovereign is (see generally Lake County Estates, Inc. v Tahoe Regional Planning Agency, 440 US 391, 401-402 [1979] [setting forth the factors]),[FN9] and there is no apparent reason to define that differently depending on whether a litigation is in state or federal court. Hyatt III confirms this point, tearing down the wall that had separated Eleventh Amendment immunity from interstate sovereign immunity, and thereby suggesting that the same doctrinal inquiry may apply to both strands of immunity (see 587 US at 236-237 [rejecting Hall's historical and analytical distinction between interstate and Eleventh Amendment immunity]). This approach has the additional virtue of ensuring that a non-state entity will be amenable to suit in both federal and state court, or neither, but not suable in one court and immune in the other. Applying those factors, I agree that NJT is not an arm of the State of New Jersey.
II.
Chief Judge Wilson has proposed an unusual approach to the issue at hand. He objects to relying on Eleventh Amendment precedent because Eleventh Amendment immunity and interstate sovereign immunity stem from distinct sources of law and (to some extent) serve different objectives (see concurring op at 24-30). That is correct as far as it goes, but, as I have said, Hyatt III's treatment of Hall reflects a unitary conception of state sovereign immunity. Whatever it means to say the Eleventh Amendment is "an Amendment" and therefore "not an immunity," (id. at 29 n 13), the Court has concluded that "the 'natural inference' from [the Eleventh Amendment's] speedy adoption is that 'the Constitution was understood, in light of its history and structure, to preserve the States' traditional immunity from private suits' " (Hyatt III, 587 US at 243, quoting Alden, 527 US at 723-724). That immunity, Hyatt III suggests, applies in both state and federal courts (see id.). The concurrence's efforts to preserve Hall's distinction sound suspiciously similar to the "the type of ahistorical literalism" the Court repeatedly has "rejected in interpreting the scope of the States' sovereign immunity" (Alden, 527 US at 730; see also Hyatt III, 587 US at 247).
The concurrence would look not to the Eleventh Amendment "arm of the State" case law, but to "customary international law and the common law" to determine whether sovereign immunity extends to a non-state entity (Wilson, Ch. J. concurring op at 2). Hyatt III explains that "[t]he Founders believed that both 'common law [*9]sovereign immunity' and 'law-of-nations sovereign immunity' prevented States from being amenable to process in any court without their consent" (587 US at 238). The decision instructs that sovereign immunity rests on these historical premises, and that "the States retained these aspects of sovereignty, 'except as altered by the plan of the Convention or certain constitutional Amendments' " (id. at 241, quoting Alden, 527 US at 713). The concurrence thus starts with the proposition that sovereigns had authority to punish those who came within their borders; points to "[m]odern conceptions of international law" that distinguish between a State's public and commercial capacities; asserts that the U.S. Constitution left untouched a State's right "to regulate matters within [its] own borders"; and concludes that only activities "that concern the essential existence and administration of a government qua government" are cloaked with immunity (Wilson, Ch. J. concurring op at 9, 19, 20).
This analysis has several flaws. First, assuming the concurrence correctly has identified a "modern" distinction between public and commercial activities, that contemporary categorization seems irrelevant to the question at hand. Hyatt III instructs that States retain the sovereign immunity they enjoyed prior to ratification, except insofar as it was altered by the adoption of the Constitution and its later amendments (see 587 US at 241-243). So even if we are to rely on immunities recognized at common law and by the law of nations, our point of reference would be the time of the Founding, not today. Hyatt III itself relied only upon pre-ratification decisions to support its conclusion that common-law and law-of-nations immunities are embedded in the constitutional design (see id. at 239-241 [discussing Nathan v Commonwealth of Virginia (1 Dallas 77 [Pa Com Pl 1781]) and Moitez v The South Carolina (17 F Cas 574 [Adm Pa 1981])]). Although the
decision also mentioned two "early foreign immunity decisions" post-dating ratification, it did so only to explain that they failed to appreciate "that the Constitution affirmatively altered the relationships between the States, so that they no longer relate to each other solely as foreign sovereigns" (587 US at 244-245). The concurrence makes the same mistake.
In an effort to sidestep this problem, the concurrence asserts that under Hyatt III, the States' common-law and law-of-nations immunities "are not static, but rather, evolve organically with changes in customary international law . . . because the Constitution cannot claim the power to freeze international law (or common law) in time" (Wilson, Ch. J. concurring op at 12). But again: if Hyatt III makes anything clear, it is that the States no longer "maintain[] sovereign immunity vis-à-vis each other in the same way that foreign nations do" (587 US at 236; see also id. at 246). By relying on modern conceptions of international law to define the scope of state sovereign immunity, the concurrence flouts this basic proposition. Its approach also contradicts the historical methodology it purports to apply. When the Court has looked to history to determine the scope of other constitutional rights, it repeatedly has said that the meaning of the Constitution was fixed at the time of ratification (see e.g. New York State Rifle & Pistol Assn., Inc. v Bruen, 597 US 1, 28 [2022], citing United States v Jones, 565 US 400, 404-405 [2012]). It is implausible that with its decision in Hyatt III the Court meant to depart from its current practice by treating state sovereign immunity as an "evolving" right. And if the Founding generation had understood that the scope of a State's immunity from private suit in a sister
State's courts, unlike any other aspect of state sovereignty, would wax and wane according to evolving sentiment, then surely the concurrence could offer some historical evidence to that effect.
Second, and relatedly, it is hardly apparent how the Founders would have viewed an entity like NJT—one that is not itself a sovereign but nonetheless exercises some powers and responsibilities that make it akin to a sovereign. The concurrence glosses over this issue as well, instead stressing that at the time of the Founding and beyond, government officers could be sued for certain torts, and foreigners (including sovereigns) held liable for some harms inflicted outside their territory (see Wilson, Ch. J. concurring op at 6-9). Even if these points might bear on the scope of immunity to which a State itself is entitled, it is unclear how they should affect whether a non-state entity may claim immunity. That unanswered question confirms the challenges that courts face in undertaking such historical analysis. Like the dissenting opinion, I would refrain from such speculation (see dissenting op at 3 n 1; see also McDonald v Chicago, 561 US 742, 910 [2010, Stevens, J., dissenting] ["It is not the role of federal judges to be amateur historians."]; Iowa v Wright, 961 NW2d 396, 427-428 [Iowa 2021, Appel, J., concurring] ["History is not granular, and it rarely points only in one direction. Even if historical truths can be discovered by judges writing opinions in a matter of weeks (and, alas, sometimes days), the historical truths are very difficult even for trained historians to discover and are often inconsistent and contradictory."]).
Third, the distinction between commercial operations and traditional (or, as the concurrence calls them, "core") governmental functions has been soundly rejected by the Supreme Court (see Garcia v San Antonio Metropolitan Transit Authority, 469 US 528, 538-547 [1985], overruling National League of Cities v Usery, 426 US 833 [1976] [disavowing "traditional government functions" as "an organizing principle" for distinguishing state from non-state functions]; see also Douglas Laycock, Modern American Remedies 510 [4th ed 2010] [explaining that "no court has ever generated a coherent set of precedents applying the distinction"]). The concurrence acknowledges that differentiating between a State's "commercial and public activities" may not always be "workable" for questions about "the balance between state and federal power," but asserts that the test can nevertheless be used "to determine the scope of interstate sovereignty" (Wilson, Ch. J. concurring op at 10 n 1). It is true, as the concurrence notes, that we have distinguished between governmental and proprietary functions in determining the scope of common-law tort immunity under state common law (see id., citing Connolly v Long Island Power Auth., 30 NY3d 719 [2018]). But the task of doing so with respect to another State's policies is fraught, and would necessarily inject us into the policy choices of that State (cf. Garcia, 460 US at 546 [noting that "the people—acting not through the courts but through their elected legislative representatives—have the power to determine as conditions demand, what services and functions the public welfares requires" (internal quotation marks omitted)]).[FN10]
And beyond that, how to determine what is a core function and what is not? The concurrence offers a minimalist view of core state functions as limited to "the exercise of police powers within its own borders, the election or appointment of its own officials, or the collection of taxes" (Wilson, Ch. J. concurring op at 2-3; see also id. at 23). That view of the State is inconsistent with the concurrence's view that state sovereignty is tethered to modern, evolving precepts of international law, and the concurrence points to nothing in the Constitution that necessitates this cramped understanding of a State's role in providing for the welfare of its citizens. As the Court explained in Garcia, "the 'traditional' nature of a particular governmental function can be a matter of historical nearsightedness; today's self-evidently 'traditional' function is often yesterday's suspect innovation" (469 US at 544 n 9). The skimpy contours of state sovereign immunity that the concurrence advances are hard to reconcile with this insight. Perhaps the concurrence means to enhance accountability for harms inflicted by bad actors, particularly a "billion-dollar . . . enterprise" (Wilson, Ch. J. concurring op at 4). That goal may be salutary (see e.g. Erwin Chemerinsky, Against Sovereign Immunity, 53 Stan L Rev 1201 [2001]), and it may counsel against a sweeping test for when a non-state entity can invoke sovereign immunity. But the "arm of the State" framework is not so broad; indeed, the result here is a determination that NJT is not cloaked with immunity.
Finally, I would not tether our jurisprudence to the prospect that one State will "create, operate and supervise a shooting gallery" within the borders of another State to "cause[] dozens of deaths each day" (Wilson, Ch. J. concurring op at 21). As even the concurrence admits, this scenario will not come to pass (see id. at 33). And if something along those lines ever transpired, the conduct would be plainly unconstitutional, and a federal court would say as much (see US Const, art 1, § 10; see also Hyatt III, 587 US at 245; Ex parte Young, 209 US 123 [1908]; Ann Woolhandler, Interstate Sovereign Immunity, 2006 Sup Ct Rev 249, 262 [2006] [explaining that the ratifiers of the Eleventh Amendment understood that "the Constitution and judiciary acts provided an avenue for federal court resolution of disputes when a citizen of one state complained of a wrong inflicted by an officer of another state"]). Moreover, the hypothetical is irreconcilable with the foundational principle of our Federalism: that, by entering into the Union, the States agreed to throw their lot in together and "no longer relate to each other solely as foreign sovereigns" (Hyatt III, 587 US at 245). In crafting a jurisprudence that governs relations with our sister States, I would not "assume the States will refuse to honor the Constitution or obey the binding laws of the United States" (Alden, 527 US at 755). Rather, as the Supreme Court has reminded us time and again, "[o]ur constitutional system . . . looks to 'the good faith of the States to provide an important assurance that "this Constitution and the Laws of the United States which shall be made in Pursuance thereof shall be the supreme Law of the Land" ' " (DeVillier v Texas, 601 US 285 [2024], quoting Alden, 527 US at 755, and US Const, art VI, cl 2 [alterations omitted]).
WILSON, Chief Judge (concurring):
New Jersey Transit sends hundreds of buses, trains and ferries into and out of New York every day, transporting hundreds of thousands of passengers each day. Unsurprisingly, a New Jersey Transit bus hit and injured a New York pedestrian crossing a New York street. According to New Jersey Transit, the pedestrian cannot sue in New York, but can sue only in New Jersey, and only if New Jersey chooses to allow it. At the outset, the majority and I are answering the same question: not whether New Jersey itself possesses sovereign immunity, but whether New Jersey Transit does.
I agree with the majority's result: The doctrine of interstate sovereign immunity as reformulated in Franchise Tax Bd. v Hyatt (587 US 230 [hereinafter Hyatt III]) does not prohibit the New York courts from hearing this lawsuit because New Jersey Transit is not clothed with sovereign immunity. But my reasoning differs substantially from the majority's in two respects. First, I disagree with the majority's conclusion that "courts must analyze how the State defines the entity and its functions, its power to direct the entity's conduct, and the effect on the State of a judgment against the entity" (majority op at 2). The majority's test would allow a State to extend its sovereign immunity to all sorts of functions without regard to whether those functions are truly the sort over which a State may claim sovereign immunity. Under the majority's rationale, if New Jersey Transit reported directly to the Governor and was instructed to run down as many New Yorkers as possible, New Jersey's sovereign immunity would prevent it from being sued in [*10]the New York courts, and it could be sued in New Jersey only if New Jersey permitted it and only to the extent permitted.
Instead, the correct test is whether the function performed by the entity is what would, under customary international law and the common law, be considered a core governmental function to which sovereign immunity would have extended, such as the exercise of police powers within its own borders, the election or appointment of its own
officials, or the collection of taxes. As regards interstate sovereign immunity, that determination would be impervious to the State's intent, the particular structure created by a State, or the potential magnitude of a judgment. Instead, the scope of sovereign immunity that extends to a State-created entity should be determined, as Hyatt III suggests, by examination of customary international law and the common law, as modified, if at all, by the U.S. Constitution. The answer is not affected by State intent, control or liability.
Second, I disagree that the Eleventh Amendment and associated caselaw has any bearing on the question at hand. The Eleventh Amendment does not define the common law or law-of-nations concepts of sovereign immunity, nor is it coextensive with those. Instead, it is a decision by the States as to how extensive the power of the federal courts would be vis-a-vis them. In short, the question of whether a state-created entity may invoke the Eleventh Amendment to bar an action in federal court is irrelevant, because the relation of New Jersey to the United States is fundamentally different from the relation between New Jersey and New York. Transplanting the meaning of "sovereign dignity" from the Eleventh Amendment context does not comport with Hyatt III.
Interstate sovereign immunity, unlike the immunity of States in federal court, involves the relation between equal sovereigns. Hyatt III holds that one State cannot decline to recognize another State's sovereignty in its own courts. However, when sovereignty is not at stake, there is no bar to a proceeding in the courts of another State. A state-created entity operating a billion-dollar interstate transportation enterprise is not a
sovereign function of any State. It is a commercial enterprise operating in daily competition with myriad private entities that also shuttle riders back and forth between New Jersey and New York. Any other holding would undermine our federalist system and threaten the "'fundamental principle of equal sovereignty among the States'" (id. at 246, quoting Shelby County v Holder, 570 US 529, 544 [2013]). 
No constitutional provision addresses whether one State can be sued in another State's
courts. The Supreme Court in Hyatt III concluded interstate sovereign immunity is implicit in the structure of the Constitution and binding upon the States as a matter of federal constitutional law. To reach that conclusion, Hyatt III relied on two key historical insights. First, state sovereignty predated the Constitution and States retained their sovereignty when they entered the Union (id. at 231). Second, the Constitution "affirmatively altered the relationships between the States so that they no longer relate to each other as true foreign sovereigns" (id.). Hyatt III instructs that interstate immunity questions must proceed from those two premises. Thus, one must examine the historical origins of sovereign immunity and the nature of the sovereignty States held prior to the ratification of the Constitution. Next, one must account for the changes the Constitution provoked, transforming States from full sovereigns to quasi-sovereign entities subject to the changes worked by the U.S. Constitution.
A.
The modern doctrine of sovereign immunity originates from the English common-law concept that a sovereign cannot be dragged into a court against its will. The concept is often restated in the maxim "the King can do no wrong," or in the words of Alexander Hamilton, "It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent" (Hamilton, Federalist No. 81). Many readings of sovereign immunity stop here. But the rhetoric justifying expansive readings of immunity tends to ignore the context-specific applications of the doctrine and obscures the long historical practice of private litigation against government entities.
The U.S. Supreme Court has identified two historical strands that inform our contemporary doctrine of sovereign immunity: "common law sovereign immunity" and "law-of-nations sovereign immunity" (Hyatt III at 238). Both doctrines, as practiced at the time of the Founding, allowed sovereign tribunals to vindicate the rights of private parties who had been harmed by government tortfeasors. For instance, "common law" immunity provided private individuals with wide latitude to sue government officers for violations of the law (see Louis L. Jaffe, Suits Against Governments and Officers: Sovereign Immunity, 77 Harv L Rev 1, 3 [1963]). The King was also subject to suit by his [*11]consent, which was later replaced by fictional consent or implicit authority rather than a strict requirement (see James E. Pfander, Sovereign Immunity and the Right to Petition: Toward a First Amendment Right to Pursue Judicial Claims Against the Government, 91 Nw U L Rev 899, 911—912 [1997]).
Sovereign immunity under customary international law, sometimes called "law-of-nations" sovereign immunity, also recognized significant limits on Sovereign A's ability to escape Sovereign B's tribunals for actions occurring in Sovereign B's territory. A sovereign's immunity did not extend outside its own territory unless the other sovereign chose to grant it immunity (see The Schooner Exchange v. McFaddon, 7 Cranch [11 US 116, 136 [1812] ["All exceptions . . . to the full and complete power of a nation within its own territories must be traced up to the consent of the nation itself. They can flow from no other legitimate source"]).
The Hyatt III Court expressly invoked law-of-nations principles to determine the scope of the immunity the framers would have expected States to hold in other States' courts. This is because, as the Hyatt III majority explained, after independence but before the adoption of the Constitution, States considered themselves "fully sovereign nations," entitled "to all the rights and powers of sovereign states" (Hyatt III at 237-238, quoting McIlvaine v Coxe's Lessee, 4 Cranch 209, 212 [1808]). Scholars have noted that the term "State" in the Constitution is itself "a term of art drawn from the law of nations" (Anthony J. Bellia Jr. & Bradford R. Clark, The International Law Origins of American Federalism, 120 Colum L Rev 835, 839 [2020]). In sum, although the law of nations does not account for the unique structure of the Federal Constitution, it illustrates the background expectations the Framers had in mind when they designed the constitutional plan.
Notably, law-of-nations immunity left sovereigns with wide latitude to punish both foreigners who transgressed within territorial boundaries and foreign sovereigns that failed to force subjects to repair the harms inflicted. Here again, rhetoric obscures the nuance of historical practice. The Hyatt III majority quotes Emer de Vattel, the foremost expert on the law of nations at the time of the Founding, as saying "'It does not . . . belong to any foreign power to take cognisance of the administration of [another] sovereign, to set himself up for a judge of his conduct, and to oblige him to alter it . . .' The sovereign is 'exemp[t] . . . from all [foreign] jurisdiction'" (Hyatt III, 139 S Ct at 1493—1494, citing 2 Emer de Vattel, The Law of Nations § 55, at 155 [J. Chitty ed. 1883] and 4 id. § 108, at 486). Although sounding sweeping in scope, Vattel's immunity mostly referred to efforts by one nation to take charge of the internal governance of another. When he explained that a foreign power could not "take cognisance of the administration of another sovereign," his quintessential examples involved a foreign sovereign who supplanted a domestic sovereign for taxing his subjects too highly, inflicting unjust punishments on his subjects, or contravening Christian morals—"things, for which [the domestic sovereign] was not at all accountable to [the foreign sovereign]" (2 id. § 55, at 155-156; accord 1 James Kent, Commentaries on American Law 20-21 [Comstock ed. 1867]). That is, the sovereign immunity protected under customary international law related to the ability of one State to interfere with the essential workings of another State. That interpretation fully squares with the result in Hyatt III, in which the Supreme Court held that California's sovereign immunity extended to protect its attempts to collect taxes from a former California resident who had relocated to Nevada, such that the Franchise Tax Board of California could not be sued in the Nevada courts. Collection of taxes is a core function of States, fully protected by their sovereign immunity.
By contrast, Vattel acknowledged a domestic sovereign's "right to preserve herself from all injury" because "when we cannot use constraint in order to cause our rights to be respected, their effects are very uncertain" (2 Vattel § 49, at 154; accord 1 Kent at 22 ["Every nation has an undoubted right to provide for its own safety, and to take due precaution against distant as well as impending danger"]). Applying sovereign immunity to bar New York's courts from hearing a case concerning injury to one of its own residents that occurred within its own territory would deny an essential element of New York's own sovereignty, while not protecting any core function of New Jersey's.
Vattel further distinguished between types of conduct in his account of the immunity afforded to the literal body of a foreign sovereign itself. If a prince were in a foreign country to negotiate or "treat about some public affair" he would be "entitled in a more eminent degree to enjoy all the rights of ambassadors," whereas "[i]f he c[a]me as a traveler, his dignity alone, and the regard due [his] nation" would "exempt[ ] him from all jurisdiction," though the host country could withdraw that protection if it so informed him (4 Vattel § 108, at 486). However, if he "act[ed] as an enemy," the prince would be entitled to no regard at all (4 id. § 108, at 486). Moreover, the foreign prince could not exercise his rights in such a manner as to "affect the sovereignty of the country in which he [was] a sojourner" (id. at 487; see also 2 id. § 92, at 169 ["the least encroachment on the territory of another is an act of injustice"]). "Even in cases of ordinary transgressions, which are only subjects of civil prosecution . . . with a view to [*12]the recovery of damages . . . the subjects of two neighboring states [we]re reciprocally obliged to appear before the magistrate of the place where they [we]re accused of having failed in their duty" (2 id. § 76, at 162). The foreign subject's sovereign was generally not permitted "to examine whether the accusation be true or false" and if the sovereign "refuse[d] to cause reparation to be made for the damage done by his subject," the sovereign would "render[] himself in some measure an accomplice in the injury and become[ ] responsible for it" (2 id. § 76—77, at 163). Thus, if we look to customary international law, as Hyatt III directs, we find that sovereigns—and more particularly the agents of sovereigns—had no immunity from torts committed in foreign lands, and that, indeed, sovereigns were expected to recompense injuries caused by their actions or actors occurring in foreign lands.
In the centuries after Vattel's writing, international law hewed to the older doctrine in ways that help clarify its application to this case. Modern conceptions of international law distinguish between circumstances in which a State acts in a public rather than in a commercial capacity and extend immunity only to the former (see John M. Rogers, Applying the International Law of Sovereign Immunity to the States of the Union, 1981 Duke L J 449, 472 [1981]). In the United States, the so-called "restrictive theory" of sovereign immunity is enshrined in the Foreign Sovereign Immunities Act of 1976 (FSIA), which establishes criteria for when a foreign state can be subjected to civil suit in the United States (28 USC §§ 1330, 1602-11; see Rogers at 472). The Act provides broad immunity to nations subject to specified exceptions. The major exception to the Act, known as the "commercial activity" exception, exempts from immunity actions arising out of a defendant's commercial activity that has a nexus with the United States (28 USC § 1605). The statute defines "commercial" and notes that whether an activity is commercial "shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose" (28 USC § 1603 [d]). Courts exercise discretion in determining whether an activity is commercial or whether it has a sufficient nexus with the United States (see e.g. Republic of Argentina v Weltover, Inc., 504 US 607 [1992]).[FN11]
The development of the restrictive theory of immunity is linked to historical changes, such as the increased phenomenon of States entering marketplaces and engaging in commercial activities indistinguishable from those customarily undertaken by private parties (Jasper Finke, Sovereign Immunity: Rule, Comity or Something Else?, 21 Eur J Int'l L 4, 853-881, 859 [2010])[FN12]. However, the principles underlying that theory are not new, but rather embrace an idea at the heart of Vattel and the law of nations. That theory balances the need to respect the sovereignty and independence of foreign states with the need to hold States to account when they encroach on the territory of other States and act outside the realm of the traditional core activities of a sovereign [FN13].
The concurrence misconstrues Hyatt III's directives and misinterprets my reference to modern international law. Hyatt III does not say that the sovereign immunity of states today is precisely what it was at the time of the founding (Halligan, J. concurring op at 7). Hyatt III instead says: "at the time of the founding . . . States were immune under both the common law and the law of nations. . . . [and] the States retained these aspects of sovereignty" (Hyatt III at 241). These "aspects" are not static, but rather, evolve organically with changes in customary international law. That is because the Constitution cannot claim the power to freeze international law (or common law) in time. Sovereign rights and obligations under international law do not remain frozen based on the obligations a nation had at the time of its founding; rather, international law conceptions of sovereignty change over time. Thus, while the sovereignty States enjoyed at the Founding provides a starting point, the Hyatt III analysis requires considering the changes in the sovereignty a modern nation-state now holds (of course, less the sovereignty the States gave up in the Constitution)[FN14]. Though the Framers in drafting the Constitution had a certain conception of [*13]the law of nations, the Framers themselves understood that the rules of the law of nations were subject to change (William S. Dodge, Customary International Law, Change, and the Constitution, 106 Geo L J 1559, 1581-1582 [2018]; see Ware v Hylton 3 US 199, 281, 1 L Ed 568 [1796] [opinion of Wilson, J.] ["When the United States declared their independence, they were bound to receive the law of nations, in its modern state of purity and refinement"] [emphasis added]; US v the La Jeune Eugenie, 26 F Cas 832, 846 [CCD Mass 1822] ["It does not follow, therefore, that because a principle cannot be found settled by the consent or practice of nations at one time, it is to be concluded, that at no subsequent period the principle can be considered as incorporated into the public code of nations"]; Letter from Thomas Jefferson to Thomas Pinckney [May 7, 1793] Founders Online, National Archives, https://founders.archives.gov/documents/Jefferson/01-25-02-0616. [Original source: The Papers of Thomas Jefferson, vol. 25, 1 January—10 May 1793, ed. John Catanzariti. Princeton: Princeton University Press, 1992, 674-676] [noting that
the principles of the law of nations "have been liberalized in latter times by the refinement of manners and morals, and evidenced by the Declarations, Stipulations and Practice of every civilized Nation"]). The subject matter, rules, and means of enforcements in international law have all changed since the ratification of the U.S. Constitution; the Constitution's texts and historical understandings must be translated "in light of [these] changes" (Dodge at 1582).[FN15]
B.
For the purposes of this appeal, however, it does not matter whether the sovereignty of state-created entities was frozen at the time the Constitution was enacted (as Judge Halligan assumes) or is altered as rules of international law change [FN16]. As Judge Halligan herself notes, "'when a [State] government becomes a partner in any trading [*14]company, it divests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen'" (Halligan, J. concurring op at 4 n 1, quoting Bank of United States v Planters' Bank of Ga., 9 Wheat [22 US] 904, 907 [1824]). Although in Planters' Bank the Court considered the Eleventh Amendment, the Court determined that because "the Planters' Bank of Georgia is not the State of Georgia, although the State holds an interest in it," it possessed no "sovereign character," and therefore could be sued in any court.
Thus, if the sovereignty of the States is as it was at the time they ratified the Constitution, Planters' Bank instructs that entities such as New Jersey Transit cannot invoke the sovereignty of the States. Judge Halligan offers an explanation: that subsequently the Supreme Court has moved to an "arm of the State" test, beginning with Mt. Healthy City Bd. of Ed. v Doyle (429 US 274 [1977]). There are two difficulties with that argument. First, Mt. Healthy and the other cited cases concern Eleventh Amendment immunity, not the inherent sovereign immunity of the States. The use of the arm-of-the-state test for that purpose does not bear on the test for the scope of the inherent sovereign immunity of States (see section IV, infra).
Second, Mt. Healthy and the other cases cited by the concurrence either support my view or are irrelevant. In Mt. Healthy, the Court relied on its longstanding doctrine that "[t]he bar of the Eleventh Amendment to suit in federal court . . . does not extend to counties and similar municipal corporations" (429 US at 280). Municipal corporations are, of course, created by States, and they serve a governmental function. Nevertheless, settled doctrine is that such entities can be sued in federal court [FN17]. If they had some sovereign immunity (setting aside the Eleventh Amendment's bar, which does not apply to them), they could not be sued at all. New Jersey Transit is even less like the State than a municipal corporation; Mt. Healthy strongly suggests it possesses no sovereign immunity.[FN18]
C.
I turn, then, to the common law. Common law is fully in accord with the law of nations. Although under English common law the maxim "the King can do no wrong" is frequently found, its meaning was limited to the monarch, not the monarch's subjects, and was not absolute even as to the monarch. Thus, for example, although the King himself could not be brought into court, "if the tortious act were that of an agent or servant of the King, it was conclusively presumed to be without his sanction. The subject might sue the actual tortfeasor, and the latter could not plead in defense that it was done by royal authority" (Herbert Barry, The King Can Do No Wrong, 11 Va L Rev 5 349, 356 [1925]). Barry recounts two illustrative cases under English common law: Earl of Danby's Case (1679), in which the King assumed responsibility for Danby's act and granted a pardon, which was deemed ineffective because of the irrebuttable presumption that the King could do no wrong; and Feather v The Queen (1865), which held:
"'from the maxim that the King cannot do wrong it follows as a necessary consequence that the King cannot authorize a wrong . . . In our opinion no authority is needed to establish that a servant of the Crown is responsible to law for a tortious act done to a fellow subject though done by authority of the Crown'" (id.).
Thus, under English common law, sovereign immunity extended to the sovereign personally but did not insulate tortious acts from suit even when directed by the sovereign (see also supra n 6).
The American common law concept of sovereign immunity, to the extent resting on the proposition that if the monarch could do no wrong, neither could the government, was cabined in the same way it had been under English common law: "the English maxim does not declare that the government, or those who administer it, can do no wrong; for it is a part of the principle itself that wrong may be done by the governing power, for which the ministry, for the time being, is held responsible" (Langford v United States, 101 US 341, 343 [1879]).
II.
The next question is whether and to what degree the unique structure of the federal Constitution altered the sovereignty States held under the law of nations or common law. Hyatt III soundly rejected Hyatt's argument that States retained the power of fully independent nations completely to deny immunity to fellow sovereigns. The Court observed that Hyatt's argument failed to account for how the Constitution and the "deprivation of traditional diplomatic tools" reordered the States' relationships with one another (Hyatt III at 248). The Constitution "divests the States of the traditional diplomatic and military tools that foreign sovereigns possess" and "deprives them of the independent power to lay imposts or duties on imports and exports, to enter into treaties or compacts, and to wage war" (id. at 245). Each State's equal dignity and sovereignty under the Constitution implies certain constitutional "limitation[s] on the sovereignty of all of its sister States" (id., quoting World-Wide Volkswagen Corp. v Woodson, 444 US 286, 293 [1980]). One of those limitations is the States' inability to ignore the sovereign immunity of their sister States (Hyatt III at 245).
Under the plan of the Constitution, the same federalist principles that protect interstate sovereign immunity bear on the question of what entities can claim sovereign immunity. Although not disturbing many of the attributes of State sovereignty, the Constitution deprived States of certain remedies they previously held as sovereigns to respond to harm caused by other States inside their own borders. Thus, if New York disapproves of New Jersey Transit's operations within New York, New York cannot cut off trade with New Jersey, forbid New Jersey Transit from operating in New York (see e.g. City of Philadelphia v New Jersey, 437 U S 617 [1978]), or declare war on New Jersey.
But just as the Constitution did not expressly disturb the right of States to be haled into the court of another State, it did not expressly disturb the law-of-nations attribute of sovereignty entitling States to regulate matters within their own borders. Hyatt III itself presented a situation in which those two rights of a sovereign were at least arguably in tension: the alleged torts occurred in Nevada, but the actions were taken by agents of California pursuing an alleged tax evader. However, whether the Franchise Tax Board was, effectively, the State of California was not at issue before the Supreme Court in any
of the three Hyatt decisions. Turning back to the law-of-nations principles discussed earlier, we can see that Hyatt III, which concerned California's ability to obtain tax revenues from its own residents, involved Nevada's interference with that core governmental function. As Hyatt III observed, "'[i]t does not . . . belong to any foreign power to take cognizance of the administration of [another] sovereign,'" which is precisely what Nevada's lawsuit would have done by allowing a tort recovery for California's attempt to pursue an alleged tax evader. Here, however, New Jersey Transit's operations are not core functions necessary to the operation of a state government; they are commercial operations that, though undeniably important, would not have been clothed with sovereign immunity when causing torts in another sovereign's jurisdiction. Instead, the sovereign in whose territory the tort occurred was the forum in which claims would be adjudicated, and a foreign sovereign refusing to make recompense would have been in violation of the law of nations.

Thus, the constitutional structure would not deem New Jersey Transit to be clothed with the immunity of the State of New Jersey. States are immune in other States' courts for their activities that are core governmental functions—functions that concern the essential existence and administration of a government qua government. Under law-of-nations principles, however, other activities by state-created entities are not.
III.
New Jersey Transit contends that New Jersey's own characterization of New Jersey Transit is controlling, and the majority, though rejecting that notion, concludes that the characterization is relevant. I disagree. As Hyatt III makes clear, the source of the sovereign immunity of the States is the law of nations and the common law, as modified by the U.S. Constitution. There is no suggestion in Hyatt III that state law figures into the equation (except to the extent it might evidence a waiver of sovereign immunity), and for good reason: if it did, States could extend their sovereign immunity to any manner of activity occurring outside of their borders, simply by enacting statutes that, for example, placed a commercial entity under direct executive branch control, stated that the entity possessed sovereign immunity, and made the State directly liable for judgments against it.
New Jersey Transit's theory would not only insulate it from all torts its buses commit in New York, but even from liability if it used the right statutory words to create, operate and supervise a shooting gallery with live ammunition in Times Square that caused dozens of deaths each day [FN19]. The same problem, to a lesser degree, infects [*15]the majority's reliance on New Jersey law to determine whether New Jersey Transit is entitled to be treated as New Jersey itself for sovereign immunity purposes. A cabining principle is required, and Hyatt III directs that the law of nations and common law, as modified by the U.S. Constitution, must be the source of that cabining principle—not State law.
To preserve the equal sovereignty between States, interstate sovereign immunity must protect those acts that are necessary to a State's functioning as a government, but cannot extend to acts that do not carry with them the essential attributes of sovereignty. Providing public transportation is undoubtedly an important function of a modern government. But the analysis for whether an entity constitutes the State for interstate immunity purposes is not whether a function is important. Rather, it is about whether that function is a necessary attribute of a State's existence and operation as a State.
In sum, both historical practice and constitutional structure protect States from being subjected to suits in sister States' courts when engaged in core governmental functions. At minimum, core functions include collecting taxes, running elections, and use of police power—acts necessary for the State to maintain its sovereign status and sustain itself as a government [FN20]. Hyatt III involved exactly that. In contrast, when a governmentally created entity is not acting in a sovereign capacity, it is no different from an individual tortfeasor. That was true under the law of nations and the common law, and the plan of the U.S. Constitution did not change that.[FN21]
[*16]IV.
The other point where I depart from the majority is its reliance on Eleventh Amendment jurisprudence to inform whether New Jersey Transit possesses New Jersey's sovereign immunity. The considerations pertaining to whether a state-created entity is deemed to be the State for purposes of Eleventh Amendment jurisprudence are not germane to the determination of whether a State is sovereign for interstate sovereign immunity purposes. The doctrines come from two very different sources and are fundamentally different in purpose and character.
Although the inability of federal courts to hear claims brought by citizens against States is often referred to as an "immunity," it is not a sovereign immunity, but a restriction of the judicial power of the federal courts alone. The Amendment reads:
"The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State" (US Const Amend XI).
The amendment does not mention sovereign immunity, but instead places a limit on the power of the federal courts. Indisputably, the Amendment was passed as a swift response to Chisolm v Georgia (2 US 419, 429 [1793]), in which a citizen of South Carolina, sued the State of Georgia to recover a debt. The Supreme Court held that Georgia had no sovereign immunity and allowed the claim to proceed. Although the U.S. Supreme Court's decisions have not been consistent as to whether Chisolm was correctly decided (compare New Hampshire v Louisiana, 108 US 76, 91 [1883] ["Under the Constitution, as it was originally construed, a citizen of one State could sue another State in the courts of the United States for himself"] with Alden v Maine, 527 US 706, 722 [1999] ["The text and history of the Eleventh Amendment also suggest that Congress acted not to change but to restore the original constitutional design"]), in any event the Eleventh Amendment concerned the power of the federal courts to entertain suits against States. The federal government itself is a creation of the States; the extent to which the courts of the States' new creation could adjudicate claims against them was a political question to which the States were free to provide any answer on which they agreed. It was not limited by law-of-nations or common law rules.
Thus, even if the motivation for the Eleventh Amendment rested, ultimately, in the States' interest in the preservation of their sovereignty, they were completely free to limit the federal power as they saw fit—without regard to the law of nations or the common law. The question the States answered, both in the Tenth and Eleventh Amendments, was how powerful they wished the federal government to be. The factors the majority borrows from federal Eleventh Amendment jurisprudence (the State's intent in creating an entity; its direction of the entity's conduct; and the effect of an adverse judgment on the State's fisc) are fine considerations when fashioning the contours of a doctrine created by the States to restrict the power of the federal courts they created, but are wholly unmoored from the dictates of law-of-nations or common law conceptions of sovereignty, which the States are not free to modify.
That difference leads to my disagreement with the majority's resort to Eleventh Amendment jurisprudence instead of the law-of-nations and common law jurisprudence to which Hyatt III directs us. Factors such as the extent to which a State will have to pay a judgment or the degree of control a State has chosen to exercise over an entity may [*17]be relevant in settling the constitutional balance between state and federal power. But those concepts have no basis in law-of-nations or common law jurisprudence.[FN22]
The majority's criticism of my approach evidences a misunderstanding both of U.S. Supreme Court precedent and of my approach. The majority understands my approach as rejecting the proposition that the Eleventh Amendment "reflects" the inherent sovereign immunity of the States or the proposition that the Eleventh Amendment confirms that the States have some measure of sovereignty not diminished by the Constitution. I accept both. The majority has confused motive and means. States had sovereignty before they ratified the Constitution. It is hardly a novel proposition, as Hyatt III notes, that States ceded some of that sovereignty by ratifying the Constitution. It is certainly true that the States viewed Chisolm as something that was an unintended and undesirable consequence of the Constitution they had just adopted, and that their view of sovereignty led them to assert their sovereignty by disabling the federal courts from hearing cases in which they were defendants. The means they chose—disabling the federal courts—was unquestionably motivated by their view as to state sovereignty vis-à-vis the federal government, and collectively they had the power to regulate that relationship as they saw fit. Although their view of their sovereignty was the reason they chose to act, the rules that have been developed to define the contours of the means they chose do not bear on the extent of sovereignty they had vis-à-vis each other. Whereas States were able to constrict or expand the power of the federal government, motivated by sovereignty or otherwise, they had no power to affect the inherent sovereignty that they possessed before ratification unless the plan of the Constitution altered it. The means chosen to restrict the federal government—the Eleventh Amendment and jurisprudence thereunder—certainly tell us that States were motivated by sovereignty, but do not tell us that the means adopted to restrict the federal government (or the jurisprudence related thereto) have import when determining the scope of interstate sovereign immunity or—more particularly—that the jurisprudence defining how to implement the chosen means helps to define the scope of interstate sovereign immunity.
To put this into a simple illustration, I post signs around my property saying, "no trespassing; persons engaged in solicitation will be prosecuted as trespassers." My motivation is my sovereignty (if we could call it that) over the property I own. I develop a system of rules about who is engaged in solicitation (e.g., it excludes solicitation for local charities but not national charities, excludes solicitation by businesses I already deal with, and excludes people who merely drop off advertising circulars without ringing the bell). Additionally, neighborhood families sometimes play catch on my lawn without permission, and I don't prosecute them. My "no trespassing" sign surely evidences my belief that I have sovereignty in my property that is important to me, but it would be a
huge mistake to infer from the solicitation rules that those rules (or my disregard of ball-playing families) determines the scope of my sovereignty. By relying on the Eleventh Amendment jurisprudence to determine the scope of interstate sovereign immunity, the majority is importing my rule barring solicitations to define the extent of my sovereignty. Hyatt III affirms that "The 'sovereign immunity of the States,' we have said, 'neither derives from, nor is limited by, the terms of the Eleventh Amendment'" (Hyatt III [587 US at 243], quoting Alden [527 US at 713] [*18][emphasis added]). As I read Hyatt III, it says that interstate sovereign immunity exists independently of the Eleventh Amendment and is not defined or cabined by the jurisprudence thereunder.[FN23]
Doubtless, the States quickly ratified the Eleventh Amendment out of concerns for an incursion on their sovereignty, which preexisted the Constitution. Thus, the Eleventh Amendment "is but one particular exemplification" of the sovereign immunity of the States (see majority op at 8, quoting Federal Maritime Comm'n v South Carolina Ports Authority, 535 US 743, 753 [2002]). But using that "one particular exemplification"—crafted by the States to set their relationship with the new federal courts—to set the rules for determining whether State actions are sovereign vis-à-vis each other, makes no sense. For example, the need for food might cause a university to negotiate a meal plan for students, but we would be mistaken to use the contours of the meal plan to set rules the university would use to provide food for the faculty club or at alumni events or, as relevant here, to define the limits of the university's authority to provide food to persons on campus. Indeed, the majority's recognition that "the Eleventh Amendment does not define the scope of the States' sovereign immunity" (majority op at 8 [quoting Federal Maritime Comm'n, 535 US 743, 753]), makes one wonder why the majority would rely on Eleventh Amendment jurisprudence to define, or even inform, the scope of state sovereign immunity.
The majority's reliance on Penn East is particularly curious. In Penn East, the Court held that the States ceded their sovereign immunity to permit the federal government to take state-owned lands through condemnation and could delegate that power to private entities. The Court rejected Justice Gorsuch's view that the Eleventh Amendment independently barred the federal courts from hearing the condemnation action because once the States ceded that sovereignty as part of the plan of the Constitution (and, as the Court noted, such actions had long been prosecuted in federal court), the Eleventh Amendment could not be read to disable the federal courts from adjudicating such actions. Contrary to the majority's assertion, this does not bear on my approach at all. I do not contend that the Eleventh Amendment has nothing to do with state sovereignty or dispute that its underlying [*19]motivation was state sovereignty. But to determine the scope of state sovereign immunity, I turn to rules that define sovereign immunity, not rules that pertain to Eleventh Amendment immunity. The majority's approach is infamously used in the parable of the blind men and the elephant, with the majority using a single body part (Eleventh Amendment doctrine) to determine the entirety of the animal (state sovereign immunity doctrine).[FN24]
Under the majority's approach, a State could create an entity and vest it with sovereign immunity regardless of its function or location—even if it operated exclusively within another State's territory—so long as the creating State announced its intent to make it a sovereign entity, directly controlled its actions, and would be responsible for a judgment against it. In my view, none of those factors is salient in determining whether a State-created entity has the sovereign immunity of the State. That analysis turns on the function of the entity. If it is the sovereign itself—meaning engaged in a function that is an essential feature of existing as a government—it is immune. If not, it is not, regardless of the intent, control or ultimate monetary liability of the State. A commercial entity licensed or run by a sovereign could not escape liability by explaining that the sovereign would have to pay a large judgment itself, or that the sovereign controlled and directed the commercial entity's actions [FN25]. As A. V. Dicey explained:
"'The King can do no wrong' . . . means, in the first place, that by no proceeding known to the law can the King be made personally responsible for any act done by him; if (to give an absurd example) the Queen were herself to shoot the Premier through the head, no court in England could take cognisance of the act. The maxim means, in the second place, that no one can plead the orders of the Crown or indeed of any superior officer in defence of any act not otherwise justifiable by law" (A. V. Dicey, Introduction to the Study of the Law of the Constitution 24 [5th ed. 1897]).
The Queen would not shoot the Prime Minister through the head, nor would New Jersey establish a shooting gallery in Times Square to murder tourists. My point, though, is that the test used to determine whether a state-created entity is entitled to sovereign immunity must account for the fanciful as well as the realistic, else it is not a logically sound test.[FN26]
The majority backtracks a little from its three-element test drawn from Eleventh Amendment jurisprudence, saying that it "analyze[s] each consideration with the fundamental goal of determining whether allowing a suit against the foreign state-created entity to proceed in our courts would offend our sister State's dignity" (majority op at 12). But if that, not the three-factor test (with freedom to diverge based on unnamed "more specific subfactors that might be relevant to some cases" [id.]), is the majority's test, it sounds suspiciously like Hall's comity test, which was emphatically overturned by Hyatt III. Moreover, what would not offend a sister State's dignity is an amorphous question. The test I propose is clear and consistent with the narrowness of the law of
nations and common law understanding of the extent to which actors other than the sovereign itself would be amenable to suit, even if the sovereign, ultimately, paid the judgment.
V.
I appreciate that the path forward from Hyatt III is unclear, that the U.S. Supreme Court must ultimately provide the rule and rationale, and that history provides room for disagreement. Very simply, though, I see nothing in history, the law of nations, the common law, the U.S. Constitution or Hyatt III that would suggest that New Jersey Transit can send buses into New York, injure New York pedestrians (whether accidentally or intentionally), and claim immunity from suit in New York.

RIVERA, J. (dissenting):

The primary issue on appeal is whether New Jersey Transit (NJT) may invoke sovereign immunity in plaintiffs' personal injury action filed in our state courts. I conclude it may do so, in accordance with the reasoning and holding of Franchise Tax Bd. of Cal. v Hyatt (587 US 230, 244-247 [2019] [hereinafter Hyatt III]). Although we reach different conclusions on this ultimate question, I agree with the majority that our analysis should consider whether this suit against NJT in a New York court offends New Jersey's dignity as a sovereign (see majority op at 2). However, unlike the majority, I do not believe that the primary consideration is whether New Jersey has disavowed "legal liability or ultimate financial responsibility" for a judgment against NJT (majority op at 16). Instead, sovereign immunity bars private suits against NJT in our courts because New Jersey: (1) regards NJT as an arm of the State; (2) empowers NJT to perform an essential governmental function; and (3) endows NJT with exclusive powers of the State in furtherance of the enabling act's statutory purpose. The latter include eminent domain, police power, and ownership of tax-exempt property in the State's name.
Notably, New Jersey has consented to private suit against NJT for alleged injurious conduct only in its own state courts. We are without constitutional power to ignore this choice and have no authority to demand that NJT answer for its conduct in New York. Doing so would be an act of superiority over New Jersey, in derogation of interstate sovereign immunity and an affront to New Jersey's dignity as a coequal, independent state.
I.
In Hyatt III, the United States Supreme Court overruled its prior precedent and held that the Constitution prohibits a state from being privately sued without its consent in the courts of another state (587 US at 244-247). The Court clarified that, "[a]lthough the Constitution assumes that the States retain their sovereign immunity except as otherwise provided, it also fundamentally adjusts the States' relationship with each other and curtails their ability, as sovereigns, to decline to recognize each other's immunity" (id. at 237).
To understand Hyatt III's implications for interstate sovereign immunity, we must examine the legal principles the Supreme Court extracted from the doctrine's history.[FN27] The interstate sovereign immunity retained in the Constitution derives from well-known and well-accepted common law and law of nations' doctrines (id. at 237-239). Preratification, "[t]he common-law rule was that no suit or action [could] be brought against the king, even in civil matters, because no court [could] have jurisdiction over him. The law-of-nations rule followed from the perfect equality and absolute independence of sovereigns under that body of international law" (id. at 238-239 [citation and internal quotation marks omitted]). And according to the "founding era's foremost expert on the law of nations":
"[i]t does not . . . belong to any foreign power to take cognisance of the administration of [another] sovereign, to set himself up for a judge of his conduct, and to oblige him to alter it. The sovereign is exemp[t] . . . from all [foreign] jurisdiction" (id. at 239 [internal quotation marks and citations omitted]).
To illustrate the "founding generations" preratification understanding, the Hyatt III Court highlighted Nathan v Virginia, where a private individual sought to collect an alleged debt of the state of Virginia by attaching certain [*20]Virginia-owned property in Pennsylvania (id. at 240, citing 1 Dall 77, 78, 1 L Ed 44 [C P Phila Cty 1781]). James Madison, as a Virginia delegate to the Confederation Congress, objected along with several others, arguing that to allow process issued by another state's court "would require Virginia to abandon its Sovereignty by descending to answer before the Tribunal of another Power" (id. at 239 [internal quotation marks and citation omitted]). Pennsylvania's Attorney General similarly advocated for dismissal of the action, arguing that it violated international law
"because all sovereigns are in a state of equality and independence, exempt from each other's jurisdiction. All jurisdiction implies superiority over the party, [] but there could be no superiority between the States, and thus no jurisdiction, because the States were perfectly equal and entirely independent" (id. at 240 [citations and internal quotation marks omitted]).
Hyatt III's historical discussion indicates that the animating principle of these preratification notions of sovereign immunity was protection of a sovereign's equal standing among its peers. The former colonies—having recently fought for independence from the British monarchy—ensured that the newly formed constitutional structure would preserve this coequal status. Therefore, the resulting constitutional design reflects that equal standing among the states. Because one sovereign cannot be forced to cede to another's demand without relinquishing its independence, no sovereign can be "haled involuntarily" before another State's courts (id. at 239). Conversely, derogation of interstate sovereign immunity by one state offends the other state's dignity as an independent sovereign possessing rights of no lesser or greater significance than those of any other state in the Union.
II.
Plaintiffs commenced the underlying personal injury suit against NJT and an NJT bus driver in New York state court for damages incurred when a NJT bus struck plaintiff spouse on a New York City street. If plaintiffs had named "New Jersey" as a defendant, there would be no doubt that the State could assert sovereign immunity from this suit on its own behalf. Plaintiffs maintain that neither defendant constitutes the "State" and therefore may not invoke immunity in its place. Since defendant bus driver is sued in her capacity as an NJT employee, she may assert an immunity defense coextensive with that of NJT (Karns v Shanahan, 879 F3d 504, 519 n 5 [3d Cir 2018], citing Kentucky v Graham, 473 US 159, 167 [1985]). Accordingly, the dispositive question is whether NJT—as a public entity charged with creating and maintaining the State's public transportation system—may invoke sovereign immunity in an action arising from NJT's performance of its governmental functions.
To resolve that question, we must determine whether NJT's relationship vis-à-vis New Jersey and its political branches is of a kind that NJT may fairly be called an arm of the State, meaning, whether within its sphere of authority, NJT acts as the State in all but name. The State's intent that a public entity should be regarded as an arm of the State informs the analysis and is entitled to certain deference, but the State cannot expand the boundaries of its sovereignty by pronouncement alone. Instead, a public entity is only an arm of the State for sovereign immunity purposes if it actually serves in that capacity. As I discuss, NJT is both recognized by New Jersey as an arm of the state and de facto functions as such.
[*21]III.
The historically-grounded reasoning of Hyatt III must be the lodestar of a proper analysis. The protection of the states' coequal status embedded in the constitutional design thus frames the relevant inquiry as to whether New Jersey controls NJT to such extent and in such manner that a suit against NJT is the intended equivalent of a suit against the State. The characteristics which establish that equivalence are (1) performance of an essential governmental function as delineated by the State; (2) the exercise of powers exclusive to the State; and (3) oversight by the political branches that constrain the public entity's autonomy. NJT bears all of these characteristics.
A.
New Jersey enacted the Public Transportation Act of 1979, which established NJT, because:
"[t]he provision of efficient, coordinated, safe and responsive public transportation is an essential public purpose which promotes mobility, serves the needs of the transit dependent, fosters commerce, conserves limited energy resources, protects the environment and promotes sound land use and the revitalization of our urban centers" (NJSA § 27:25-2 [a]).
The State's role in this venture is "a matter of public policy" for "it is the responsibility of the State to establish and provide for the operation and improvement of a coherent public transportation system in the most efficient and effective manner" (id. § 27:25-2 [b]). "In furtherance of these findings and declarations," the legislature created NJT "as an instrumentality of the State exercising public and essential governmental functions," and endowed it "with the necessary powers to accomplish the purposes and goals" of the Act, "including the power to acquire and operate public transportation assets" (id. § 27:25-2 [b], [e]). Thus, NJT was established to develop and maintain an efficient statewide public transportation system accessible "to the transit dependent" with its attendant benefits to the State-at-large (id. § 27:25-2 [a]). Indeed, NJT asserts that it is the largest public statewide transportation system in the United States, "providing nearly 270 million passenger trips each year" ("NJT Plans," New Jersey Transit, https://www.njtransit.com/plans [accessed Oct. 1, 2024]; "About Us," New Jersey Transit, https://www.njtransit.com/our-agency/about-us [accessed Sept. 29, 2024]). In furtherance of its accessibility goals, NJT also states that it provides "publicly funded transit programs for people with disabilities, senior citizens and people living in the state's rural areas who have no other means of transportation" (id.).[FN28]
Thus, because NJT's enabling Act expressly declares that NJT is "an instrumentality of the State" (NJSA § 27:25-2 [b]) and assigns to NJT the State's responsibility for New Jersey's public transportation system, the legislature intended for NJT to be regarded as an arm of the State in the constitutional sense.[FN29] The fact that this is the [*22]position advanced by New Jersey's Attorney General in other litigation (see e.g. Maison v New Jersey Tr. Corp., 245 NJ 270, 245 A3d 536 [2021]) further confirms New Jersey's view that NJT is its legal equivalent for sovereign immunity purposes.
B.
The New Jersey Legislature has also endowed NJT with core powers of that State. NJT may acquire property through eminent domain (NJSA §§ 27:25-13 [a], [c] [1]), a recognized "attribute of sovereignty" that "appertains to every independent government" (Mississippi & Rum River Boom Co. v Patterson, 98 US 403 [1878]). And NJT has its own
security force with "general authority, without limitation, to exercise police powers and duties . . . in all criminal and traffic matters at all times throughout the State" (NJSA § 27:25-15.1 [a]), powers solely "vested in the States" (Natl. Fedn. of Ind. Bus. v Sebelius, 567 US 519, 536 [2012]; see also Karns, 879 F3d at 517 [noting NJT security force powers are "the official police powers of the state"]). Further, NJT is exempt from State taxation and under the Act, "any property owned by [NJT] or any wholly owned business corporation or other entity shall be considered 'State' property" (NJSA § 27:25-16).
In holding that NJT could invoke immunity against suit in federal court, the Third Circuit observed that these powers and tax-exempt status are judicially recognized as hallmarks of sovereignty (879 F3d at 517). And although Karns involved Eleventh Amendment immunity, that is a distinction without a difference when it comes to analyzing NJT's powers as traditional exemplars of State sovereignty (see Alden v Maine, 527 US 706, 713 ["The phrase ('Eleventh Amendment immunity') is convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment. Rather, as the Constitution's structure, its history, and the authoritative interpretations by this Court make clear, the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today (either literally or by virtue of their admission into the Union upon an equal footing with the other States) except as altered by the plan of the Convention or certain constitutional Amendments."]). On that point, the Third Circuit's comparison of NJT's statutory authority to powers reserved to sovereign States is both instructive and compelling.
[*23]C.
New Jersey's political branches wield significant control over NJT by way of appointment and veto powers. NJT is situated within the New Jersey's Department of Transportation, a principal department of the Executive Branch (NJSA § 27:25-4 [a]). Although NJT is statutorily "independent of any supervision or control by the [Department] or by any body or officer thereof" (id.), the political branches constrain NJT's power. The Governor appoints NJT's entire 13-person governing Board (see NJSA § 27:25-4 [b]). Several are members of the Executive Branch and the eight public members are appointed upon the advice and consent of the New Jersey Senate—with one each appointed upon recommendation of the President of the Senate and the Speaker of the General Assembly and two upon the Governor's recommendation (id.). The Commissioner of Transportation is an Executive Branch officer who serves as chair of the Board with the power to review NJT's expenditures and budget (id. § 27:25-4 [d]). NJT is statutorily required to submit an extensive annual report to the Governor and Legislature on topics including NJT's budget and operating expenses, personnel, safety violations, and, as relevant here, detailed accident data (id. § 27:25-20 [b]). NJT is also subject to audit at any time by the State auditor—a legislative official—or their authorized representative (id. § 27:25-20 [e]).[FN30] Furthermore, the Governor has authority to veto any and all actions of the NJT board, and in fact "[n]o action taken at such meeting by the board shall have force or effect until approved by the Governor or until 10 days after such copy of the minutes shall have been delivered" (id. § 27:25-4 [f]). The legislature may also veto certain NJT proposed acquisitions by condemnation (id. § 27:25-13 [h]). Although NJT has the authority to sue and the capacity to be sued, that pales in comparison to the political branches' extensive influence over NJT's governing body and budgetary policies. "All of these facts suggest that [NJT] is an instrumentality of the state, exercising limited autonomy apart from it [, and] weigh[ ] in favor of immunity" (Karns, 879 F3d at 518).
It is also significant that New Jersey has chosen to waive its immunity from suits against NJT solely in the state of New Jersey. The New Jersey Tort Act provides that every "public entity" in New Jersey is liable in tort "in the same manner and to the same extent as a private individual under like circumstances" (NJSA § 59:2-2[a] - [b]). New Jersey has thus chosen to permit plaintiffs and others alleging injury by NJT to seek redress, but only in their own courts. We cannot refuse to honor that choice by elevating the interests of our residents in a New York forum over those of the State of New Jersey to decide whether and when to permit such private suit.
For the reasons I have discussed, in accordance with the reasoning and holding of Hyatt III, I would hold that NJT is an arm of the state that may invoke sovereign immunity from private suit in our state courts as it has done here.
IV.
The majority "distill[s] from Hyatt III and other federal cases" three factors to be considered when determining the applicability of sovereign immunity and then proceeds to apply those factors to NJT in support of its conclusion that NJT is not an arm of New Jersey (majority op at 11). The first and second factors are similar to those I have identified as relevant to our analysis: "how the State defines the entity and its functions" (id. at 12; supra at 5), and "whether the State directs the entity's conduct such that the entity acts at the State's behest" (majority op at 14; supra at 6). Notwithstanding the majority's attempt to recast their "balancing test," the majority erroneously undervalues both of the first two factors. As to the first, the majority concludes the State's interest "leans toward according NJT sovereign immunity" (majority op at 14). The second is even less consequential because, the majority concludes, the State's power over NJT "does not weigh heavily in either direction" (id. at 15). However, these overlapping considerations support sovereignty for the reasons I have discussed above (supra at 6-11).
The majority's most significant mistake is its adoption as a third factor "whether the entity's liability is the State's liability, such that a judgment against the entity would be an affront to the State" (majority op at 15), which the majority weighs against immunity because the State has "disclaimed legal liability for judgments against NJT" (id. at 16). That last factor weighs heavily, and is often the deciding factor, in an Eleventh Amendment analysis (see Regents of the Univ. of California v Doe, 519 US 425 [1997]; Hess v Port Auth. Trans-Hudson Corp., 513 US 30, 51 [1994]; but see Karns, 879 F3d at 518). As the Supreme Court has explained, "the States' solvency and dignity" are "the concerns . . . that underpin the Eleventh Amendment" (Hess, 513 US at 52-53). But the State's solvency is of [*24]little consequence here when we are dealing with interstate sovereign immunity, and the inquiry at hand is whether allowing plaintiffs' suit to proceed in New York state court alters New Jersey's coequal status among the states, in contravention of the constitutional design (see Hyatt III, 587 US at 246).
The majority compounds its error by rendering this third factor dispositive. According to the majority, one factor weighs on each side of the scale and another has no effect at all on its analysis, thus, the majority could just as easily have concluded that NJT is an arm of the State. Indeed, the majority provides no rational basis—and I can see none—for holding that New Jersey's lack of legal liability for a verdict against NJT tilts the scales and outweighs the first and second factors—the State's intent in creating NJT and its power over NJT's conduct. On its own terms, then, the majority's analysis is illogical and its conclusion unjustifiable.[FN31]
Even viewed through the majority's ill-selected Eleventh Amendment prism, the majority's conclusion that NJT may not invoke immunity as an arm of New Jersey is an outlier view. The Third Circuit has expressly abandoned "an analytical framework [that] 'ascribe[s] primacy to the [state-treasury] factor'" (Karns, 879 F3d at 513 [internal citation omitted]), and, instead, "each of the factors is considered 'co-equal,' and 'on the same terms'" (id.). Applying this "evolved approach," the Karns court concluded that, even though the state-treasury factor did not favor immunity, NJT was nonetheless an arm of the State and entitled to Eleventh Amendment immunity (id. at 516, 519). Other federal and state courts have also found NJT to be an arm of the State (see, e.g., Davis v New Jersey Tr., 2012 WL 3192716, *3 [NJ Super Ct App Div Aug. 8, 2012, No. A-4901-10T1]; Dykman v NJT, 685 F Supp 79, 80 [SD NY 1988]; Williamson v NJT, 1987 US Dist LEXIS 115, *1-2 (SD NY Jan. 9, 1987); Brotherhood of Locomotive Engineers v NJT, 608 F Supp 1216, 1217-18 (SD NY 1985). And post-Hyatt III, the Commonwealth Court of Pennsylvania held that NJT is an arm of New Jersey (Marshall v Southeastern Pennsylvania Transportation Auth., 300 A3d 537, 543 n 8 and at 546 n 14 [Pa Commw Ct 2023]).
V.
The Appellate Division held that NJT was an arm of the State under its departmental precedent holding the same (206 AD3d 126, 128 [1st Dept 2021], citing Fetahu v NJT, 197 AD3d 1065 [1st Dept 2021]). But the Appellate Division refused to afford NJT immunity because, under that Court's reading of New Jersey law, plaintiffs would have no forum to litigate their claim, an intolerable result (id. at 129). I agree for the reasons stated by the majority here that the Appellate Division's application of a forum non conveniens analysis to reach its conclusion was error (majority op at 17).
The remaining issue is whether there is any other legal basis to reject NJT's sovereign immunity defense. Plaintiffs contend that, even if NJT may invoke sovereign immunity, it implicitly waived that defense based on its dilatory conduct below.[FN32] NJT maintains that immunity is not waivable, but claims, in the alternative, that it has not waived its defense. NJT's first argument is foreclosed by Henry v New Jersey Tr. Corp., wherein we stated that "[t]he history and nature of interstate sovereign immunity guide us to the conclusion that the doctrine more closely aligns with jurisdiction over a party, rather than over all subject matter concerning that party" and accordingly this defense can be waived "based on litigation conduct" (39 NY3d 361, 372 [2023]). Whether on the record before us NJT has waived immunity as a matter of law is a close question.
In its answer, NJT asserted, in conclusory language, that "Plaintiffs' recovery, and/or claims in this litigation [ ] against Defendants is barred by lack of jurisdiction over NJT," that "Plaintiffs' recovery should be barred as this [*25]Court lacks jurisdiction," and that "Defendants are immune from suit." But NJT failed to move for dismissal on sovereign immunity grounds until July 2020, over a year and a half after filing its answer in January 2018, over year after Hyatt III was decided, and after the New Jersey statute of limitations expired in February 2019. This conduct suggests the type of gamesmanship we frowned upon in Henry (see 39 NY3d at 366). Moreover, between commencement of plaintiffs' personal injury action and NJT's motion to dismiss, three depositions were held, a discovery motion disputed, and nine stipulations entered. NJT made no effort to avoid potentially unnecessary litigation and the costs associated with a wasteful expenditure of party and judicial resources. Nevertheless, NJT asserted immunity in its pleading, which we must construe liberally and which preserved the defense (34-06 73, LLC v Seneca Ins. Co., 39 NY3d 44, 51 [2022]). And although NJT's delay is troubling, it acted earlier than it did in Henry where it raised sovereignty after litigating to a jury verdict (39 NY3d at 361, 365). On the totality of this record, I conclude that NJT's conduct does not constitute an implicit waiver of its sovereign immunity defense.
VI.
New Jersey regards NJT as an arm of the State in its exercise of the essential governmental function to provide a statewide accessible public transportation system, a function that is the sole responsibility of the State. The New Jersey Legislature has endowed NJT with powers traditionally and exclusively exercised by the State, and New Jersey's Legislature and Executive branch exercise significant control over NJT's management, expenditures and budget. Therefore, NJT is an arm of the State authorized to invoke interstate sovereign immunity. The majority's contrary decision requires that New Jersey "abandon its Sovereignty by descending to answer before the Tribunal of another Power" (Nathan v Virginia, 1 Dall 77, n, 1 LEd 44 [C P Phila Cty 1781]). The Constitution forbids that result, and I therefore dissent.
Order affirmed, with costs, and certified question answered in the affirmative. Opinion by Judge Singas. Judges Garcia, Cannataro, Troutman and Halligan concur, Judge Halligan in a concurring opinion. Chief Judge Wilson concurs in result in an opinion. Judge Rivera dissents in an opinion.
Decided November 25, 2024 

Footnotes

Footnote 1: The Supreme Court has explained that the phrase "Eleventh Amendment immunity" is a "misnomer" because "States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution" (Alden v Maine, 527 US 706, 713 [1999]; see Northern Ins. Co. of N. Y. v Chatham County, 547 US 189, 193 [2006]).

Footnote 2: The concurrence's analysis eschewing the use of federal court arm-of-the-state jurisprudence (see Wilson, Ch. J., concurring op at 24-34) rests on this flawed premise.

Footnote 3: The Court has cautioned, however, that a State's actual control over a state-created entity is not necessarily dispositive, because "ultimate control of every state-created entity resides with the State, for the State may destroy or reshape any unit it creates" (Hess, 513 US at 47).

Footnote 4: The Third Circuit previously considered NJT not to be an arm of New Jersey for nearly three decades (see Fitchik v New Jersey Tr. Rail Operations, Inc., 873 F2d 655 [3d Cir 1989]). Recently, however, the Third Circuit overruled that precedent, in part, based on its view that the Supreme Court has shifted away from emphasizing the state fisc in the context of state sovereign immunity in federal court, therefore tipping the result of the Third Circuit's balancing test the other way (Karns, 879 F3d at 518-519; but see Galette v NJ Transit, 2023 PA Super 46, 293 A3d 649 [2023], appeal granted 313 A3d 450 [Pa 2024] [holding that NJT is not an arm of New Jersey in the interstate immunity context]). While we of course respect the Third Circuit's analysis, we "remain at liberty to answer" this question "in a manner that may conflict with the determinations of courts in our [or other]
federal circuit[s]" (Sue/Perior Concrete & Paving, Inc. v Lewiston Golf Course Corp., 24 NY3d 538, 551 [2014]).

Footnote 5: We decline to adopt the concurrence's circular "core functions" framework (Wilson, Ch. J., concurring op at 23 [an entity is entitled to sovereign immunity if it performs functions that are "necessary for the State to maintain its sovereign status and sustain itself as a government"]), which pays lip service to, but is entirely unmoored from Hyatt III. The concurrence also disregards that the U.S. Supreme Court maintains original and exclusive jurisdiction over disputes between States (see US Const, art III, § 2).

Footnote 6: We reject the dissent's strawman argument that the practical impact of a judgment is our "primary consideration" (dissenting op at 2). As with all balancing tests, the impact of individual factors will vary from case to case.

Footnote 7: Defendants' argument that allowing this suit to proceed contravenes the Full Faith and Credit Clause fails. Our analysis seeks only to apply federal constitutional sovereign immunity principles—we neither apply New York law, nor decline to apply New Jersey's (see Franchise Tax Bd. of Cal. v Hyatt, 578 US 171, 176 [2016]).

Footnote 8: Some have recommended reviving this approach (see e.g. Puerto Rico Ports Auth. v Federal Mar. Commn., 531 F3d 868, 881-884 [DC Cir 2008, Williams, J., concurring] [arguing for a return to the test that existed "in the days before Mt. Healthy"]; Springboards to Educ., Inc. v McAllen Ind. Sch. Dist., 62 F4th 174, 187-199 [5th Cir 2023, Oldham, J., concurring] [same]). It rested on the "principle[] that when a government becomes a partner in any trading company, it devests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen" (Planters' Bank, 22 US at 907). Under this theory, the State could not "identify itself with [a] corporation" created by yet independent of the sovereign (id.), because at common law a corporate entity was understood as "an artificial person, existing in contemplation of law, and endowed with certain powers and franchises . . . considered as subsisting in the corporation itself" (Trustees of Dartmouth College v Woodward, 4 Wheat [17 US] 518, 667 [1819, opinion of Story, J.]). The Supreme Court has not indicated it agrees with these recommendations.

Footnote 9: The dissent contends that a court should not consider whether the entity's liability is the State's liability because this factor does not impact a State's "coequal status among the states" (dissenting op at 12-13). Although the Supreme Court has instructed that protection of the State fisc is not the singular focus of state sovereign immunity (see Federal Maritime Comm'n, 535 US at 765), a concern for state solvency plainly must be relevant given that any significant impact on a State's finances will hinder its ability to serve the basic needs of the polity. As the Supreme Court has explained, "state sovereign immunity serves the important function of shielding state treasuries and thus preserving 'the States' ability to govern in accordance with the will of their citizens' " (id., quoting Alden, 527 US at 750-751).

Footnote 10: Congress's treatment of foreign sovereigns does not implicate principles of federalism, and thus the concurrence's reliance on the "commercial activity" exception of the Foreign Sovereign Immunity Act of 1976 (28 USC § 1605) is misplaced.

Footnote 11: The extensive use of the distinction between commercial and public activities by Congress and the Court in determining the scope of international sovereignty helps explain why the concurrence's observation, based on Garcia v San Antonio Metro. Tr. Auth. (469 US 528 [1985]) is inapposite. Garcia overruled National League of Cities v Usery (426 US 833 [1976]), a case that limited Congress' commerce power over the States. In overruling National League of Cities, Garcia held that state sovereignty was not a bar to federal legislation subjecting state employees to the Fair Labor Standards Act (FLSA). Both cases concern the rules to determine the balance between state and federal power as set out in the Constitution—not the rules to determine questions of interstate sovereignty. Conceptually, relying on those rules instead of rules concerning co-equal sovereigns is the same mistake as made when relying on Eleventh Amendment rules to determine the scope of interstate sovereignty (see Part III, infra). (As a result of the Garcia decision, Congress amended the FLSA to modify its application to public sector employees—which further illustrates that the "vertical" separation-of-powers questions in that case are inapposite here). It is also worth noting that similar distinctions are routinely made in other areas of law. For example, our courts must determine whether New York State government entities are acting in a "proprietary" or "governmental" capacity to assess their immunity from tort liability (see e.g. Connolly v. Long Island Power Auth., 30 NY3d 719 [2018]). Although this New York doctrine does not inform the substance of interstate sovereignty, it does undercut the concurrence's reliance on Garcia outside of its specific context to support a more general proposition that distinctions between governmental and commercial functions are not workable. The concurrence's observation that the FSIA does not involve federalism concerns, and reliance on it is therefore misplaced, assumes the answer to the question posed here (Halligan, J. concurring op at 11, n 3). Federalism altered some aspects of the sovereignty of States but left others intact. The question here is whether a State-created entity engaged in a commercial activity was clothed with the State's sovereignty before the Constitution was adopted, and whether the Constitution altered that. To say "federalism"—that the States are now part of the Union—does nothing to illuminate the answer to that question. To the extent the States retained sovereignty that was unaffected by the Constitution, the FSIA is directly relevant, because as to that sovereignty the States are no different that foreign nations. If the Constitution in some way augmented or restricted the scope of State sovereign immunity applicable to commercial entities of their creation, the FSIA remains relevant at least to disprove the majority's and concurrence's statements that a distinction between governmental and proprietary functions is not workable.

Footnote 12: When the U.S. Constitution was ratified, and for more than a century thereafter, transportation was conducted by private companies, whether stagecoaches, railroads or ships (see Robert Jay Dilger, American Transportation Policy 5, 8-10 [1954]). Even early American roads, such as turnpikes, were operated by private companies chartered by States (id. at 8; see Russell Bourne, Americans on the Move: A History of Waterways, Railways, and Highways 27-30, 34). There was, at the time the U.S. Constitution was adopted, no evidence to suggest that transportation across state lines was considered a governmental function at all, much less a sovereign one (Bourne at 34). I do not rely on the above history as imposing a limit on state sovereignty simply because these facts existed at the time of the Founding, but rather as evidence that, at the time of the Founding, it was understood that state governments could function without operating private transportation companies.

Footnote 13: Other than in result, there are only small differences between my approach and that of the dissent. Both our analyses are informed by pre-ratification history, and although the dissent mischaracterizes my approach as solely based on that history, my approach is not so hidebound. As explained immediately above, the current conception of state sovereignty is also informed by modern conceptions of international law. The material difference between our approaches is that, whereas the dissent looks to New Jersey law to inform the determination of the reach of its state sovereignty, I disagree that an individual State's statutory definition is relevant to determine the entity's immunity outside that State's borders.

Footnote 14: Contrary to the concurrence's claim, I fully accept Hyatt III's holding that "the States no longer "maintain[] sovereign immunity vis-à-vis each other in the same way that foreign nations do" (Halligan, J. concurring op at 8 [quoting Hyatt III, 587 US at 236]). Many provisions in the Constitution, including the Commerce Clause, Full Faith and Credit Clause and virtually all of the Constitutional provisions organizing the federal government, constitute incursions on State sovereignty. But this does not mean the law of nations is irrelevant. To the contrary, the Hyatt III Court affirmed that state sovereignty is an attribute of the law of nations and cited law-of-nations principles in its own analysis (Hyatt III, 587 US 230, 239-240; see supra at 6). Those principles are not the only factor in the analysis, as they do not account for the unique structure of Constitution and the sovereignty States gave up in enacting it, but they must be considered, and they should be considered in their modern form. When the Constitution was enacted, there was no jus cogens norm prohibiting slavery. Today there is, and that would restrict the States' sovereignty to reinstitute slavery with or without the Constitution. Thus, the concurrence's observation that the Court has "fixed" the meaning of the Constitution's text in its interpretation of certain constitutional rights (such as the Second Amendment in the Bruen line of cases) is off point (Halligan, J. concurring op at 8). The Constitution has no power to fix the scope of state sovereignty in time, and the States have no sovereign power to violate jus cogens norms of international law today even if those norms did not exist at the time of the Constitution's ratification.

Footnote 15: For example, at the time of the Constitution's ratification, slavery and genocide were not violations of customary international law. In Vattel's time, sovereigns could support slavery or commit genocide within their own territory and no other sovereign would have had the right to interfere. The international prohibition of both was first expressed in conventions; today, both are recognized as jus cogens norms of customary international law (see Restatement [Third] of the Foreign Relations of the United States § 702; see also Silvia Scarpa, Slavery, Oxford Bibliographies in International Law, https://www.oxfordbibliographies.com/display/document/obo-9780199796953/obo-9780199796953-0097.xml [last updated May 29, 2014] ["Prohibitions of slavery and the slave trade in times of both peace and war are unanimously considered to be customary rules of international law, and they have attained the level of peremptory norms (jus cogens principles)"]; United Nations, The Global Fight for Justice: How Genocide Prevention Became Law, https://www.un.org/en/video/global-fight-justice-how-genocide-prevention-became-law [last accessed Oct. 11, 2024] ["The International Court of Justice (ICJ) has repeatedly stated that the Convention embodies principles that are part of general customary international law. This means that whether or not States have ratified the Genocide Convention, they are all bound as a matter of law by the principle that genocide is a crime prohibited under international law"]; Reservations to the Convention on the Prevention and Punishment of the Crime of Genocide, Advisory Opinion, 1951 I.C.J. 15, 23 [May 28] ["(T)he principles underlying the (Genocide) Convention are principles which are recognized by civilized nations as binding on States, even without any conventional obligation"]). The Constitution is no more able to freeze the customary law of sovereignty in time than it is able to do so for genocide or slavery. 

Footnote 16: The concurrence observes that the expansion of "traditional" functions of State governments is inconsistent with my position that sovereignty is informed by changes in international law, but it does so by conflating "traditional" with "core." In 1600, the King of England created the East India Company; several other European nations followed suit. The East India Company is "traditional," in the sense that it existed centuries ago, but—quite pertinently here—it was subject to suit for its commercial activities but not for its governmental acts in Asia, where it acted essentially as a sovereign (see Philip J. Stern, The English East India Company and the Modern Corporation: Legacies, Lessons, and Limitations, 39 Seattle U L Rev 423, 432-33 [2016] ["the East India Company was subject at various times to common law and equity courts, civil law courts, or the prerogatives and obligations of the law of nations . . . (but) the East India Company in Asia nonetheless continued to operate its own courts and establish its own law"]; compare Nabob of the Carnatic v East India Company, 30 Eng. Rep. 521, 523 [1793] [Ch.] [dismissing action on sovereign immunity grounds where the East India Company's challenged acts were in the nature of treaty making] with Moodalay v Morton, 28 Eng. Rep. 1245, 1246 [1785] [Ch.] [rejecting sovereign immunity where the East India Company's challenged acts were commercial]). In short, all core functions are traditional, but not all traditional functions are core.

Footnote 17: See, e.g., Lake Country Estates, Inc. v Tahoe Regional Planning Agency (440 US 391, 401 [1979] ("the Court has consistently refused to construe the [Eleventh] Amendment to afford protection to political subdivisions such as counties and municipalities, even though such entities exercise a 'slice of state power'").

Footnote 18: Hess v Port Auth. Trans-Hudson Corp. (513 US 30 [1994]) holds that the Eleventh Amendment does not bar the federal courts from hearing claims against an entity formed with federal approval pursuant to the Compact Clause, because in such cases "the federal tribunal cannot be regarded as alien in this cooperative, trigovernmental arrangement." That holding is unrelated to any issue present here. In Regents of the Univ. of California v Doe (519 US 425 [1997]), the Court answered the "narrow question . . . [of] whether the fact that the Federal Government has agreed to indemnify a state instrumentality against
the costs of litigation, including adverse judgments, divests the state agency of Eleventh Amendment immunity" (id. at 426). The Court expressly declined to address whether the University enjoyed the sovereign immunity of California (id. at 431-32). Thus, the case says nothing about even the scope of Eleventh Amendment immunity, much less the inherent sovereign immunity of state-created entities. Finally, in Lake Country Estates, another Eleventh Amendment case involving an entity created pursuant to the Compact Clause, "California and Nevada have both filed briefs in this Court disclaiming any intent to confer immunity on" the entity they had created with federal approval (440 US at 401). Both Eleventh Amendment immunity and sovereign immunity are waivable, so Lake Country tells us nothing about the scope of New Jersey Transit's claim to immunity.

Footnote 19: By referring to the Supreme Court's original jurisdiction over disputes between States (majority op at 14, n 5), the majority may be suggesting that New York could bring a parens patriae suit against New Jersey directly in the U.S. Supreme Court under some unspecified circumstance and under some unspecified theory, that somehow would prevent New Jersey from either setting up a shooting gallery in Times Square or negligently running over New York pedestrians on New York City streets. The majority's suggestion is novel in its vagueness and in historical practice. The Court's original jurisdiction is commonly used in cases of boundary disputes or interstate water rights (see e.g. Kansas v Missouri, 322 US 213, 654 [1944]; New Jersey v New York, 283 US 336 [1931]). It is difficult to envision a scenario in which New York could bring suit against New Jersey under the Supreme Court's original jurisdiction to resolve a citizen's ordinary tort claim (whether intentional or negligent), or even a collection of them. Were such a claim viable, in asking the source of the rule of decision when weighing the sovereignty interests of one state against the sovereignty (or other) interest of the other, it is worth noting that, in exercising its original jurisdiction, the Court has applied principles of international law to resolve interstate disputes (see e.g. Louisiana v Mississippi, 202 US 1, 49-50 [1906] [applying the "thalweg" doctrine of international law to a boundary dispute]). Unlike the Eleventh Amendment jurisprudence on which the majority relies, such cases, which involve disputes between co-equal States, suggest that my approach, not the majority's, is correct.
As to the concurrence's terse observation that New Jersey's operating a shooting gallery in Times Square "would be plainly unconstitutional" (Halligan, J. concurring op at 12), it is not clear what part of the Constitution would support that claim. It is also unclear why a suit to enjoin New Jersey from running a negligently constructed shooting gallery in Times Square would not offend New Jersey's sovereignty but a suit to enjoin it from driving buses negligently would. Perhaps the analysis rests on the difference between injunctive and monetary relief, though the citations to Ex Parte Young and the Woolhandler article do not illuminate the point. The former suggests that the Eleventh Amendment would not bar a suit in federal court against the bus driver to stop driving negligently (or perhaps against the New Jersey Transit official responsible for hiring drivers, to enjoin that person from hiring negligent drivers), and latter suggests that before the Eleventh Amendment, the Constitution would have allowed a federal damage suit against the driver, though not after. In any event, the shooting gallery might be immensely profitable, and shutting it down via an injunction might have a very substantial impact on New Jersey's fisc. My view is much simpler: unless a New York lawsuit would impair the core governmental functions of New Jersey, what happens in New York stays in New York.

Footnote 20: The concurrence critiques my approach for offering a "skimpy" "minimalist" view of a State's core functions (Halligan, J. concurring op at 11). Again, the question here is not whether a function is socially useful; the question is whether a State is immune for that function when a commercial actor of its creation and under its supervision inflicts injuries upon persons outside its own borders. My answer may or may not "enhance accountability for harms inflicted by bad actors," but it does not cramp the ability of a State to "provid[e] for the welfare of its citizens" (Halligan, J. concurring op at 11)—except in the sense that it might stop a State from pillaging a neighbor. It establishes a limiting principle to distinguish between those functions that are inherently "State-like," and those functions that are not (i.e., when a State is acting no differently than a private party might). Distinguishing by function also offers the benefit of simplicity, in contrast to the majority's absence of a test—refraining from choosing among the several different multi-factored tests offered by the federal appellate courts on the ground that they all lead to the same result in this case.

Footnote 21: For two reasons, I disagree with the concurrence that drawing this distinction with respect to another State's policies is "fraught" (Halligan, J. concurring op at 10). First, New York is not drawing the distinction with respect to another State's policies—the U.S. Constitution is, and the test will ultimately be determined by the Supreme Court, not any State court. We just happen to be the ones with this case at this moment, but even we are not trying to determine the question based on any New York law, but rather on the U.S. Constitution, about which we are required to make interim judgments from time to time.
Second, the concurrence again cites Garcia, this time for the proposition that distinguishing between another State's governmental and proprietary functions is a matter be left to the people "acting not through the courts but through their elected legislative representatives" (Halligan, J. concurring op at 10). However, although New Yorkers and New Jerseyans are represented in Congress (and through their representatives can decide, apropos of Garcia, whether they want state employees to be subjected to federal labor laws), New Yorkers are not represented in New Jersey's legislature. With respect to New Jersey Transit's operation within New York borders, New Yorkers have no power to "determine. . . what services and functions the public welfares requires" (id., quoting Garcia, 460 US at 546 [internal quotation marks omitted]). The dissent makes the same mistake (see dissenting op at 7, n 2 ["(A) judge is not in a better position than a duly-elected legislature to choose for its population what are its government's core functions"]). The New Jersey legislature may have the power to determine what functions are "essential" and thereby immune within New Jersey's borders (dissenting op at 7), but when New Jersey inflicts injuries within the territory of another sovereign, it cannot be the case that New Jersey can decide which of its acts are immune. The dissent would not give New Jersey the final say, but rather, would have the judiciary determine "whether that state has sufficient control over a public entity" such that it is an arm of the State (dissenting op at 7, n 2). I agree with the dissent that the judiciary—ultimately the U.S. Supreme Court—must determine whether an entity like New Jersey Transit benefits from the State's sovereign immunity, but I disagree that the State's self-described statutory "control" over the entity should be relevant to that determination.

Footnote 22: The disagreement between the majority and dissenting opinions as to whether the impact on a State's fisc affects the determination of the scope of sovereign immunity is better resolved by my approach (compare majority op at 15-16 with dissenting op at 2). The question, as I see it, is not whether or how much a State's fisc is affected, but the nature of function the foreign state seeks to adjudicate. If State A would impair State B's fisc by rendering a decision that interferes with State B's core governmental functions (as in Hyatt II), State B's sovereignty acts to bar that suit. But if, as in this case, State A's adjudication of an injury caused within the borders of State A by an entity created by State B would impair State B's fisc through a judgment against State B's injury-causing entity, State B's sovereignty would not bar that suit. In the first example, State B cannot avoid an adjudicatory effect on its fisc without curtailing a core governmental function (taxation of its residents, in Hyatt III); in the second, State B can avoid an adjudicatory effect on its fisc by curtailing its operations within State A's borders. Or, more sensibly, it can account for the cost of foreign tort judgments in the business plan for its extraterritorial commercial operations.

Footnote 23: The concurrence claims that Hyatt III tore "down the wall that had separated Eleventh Amendment immunity from interstate immunity" and "suggest[ed] that the same doctrinal inquiry may apply to both strands of immunity" (Halligan, J. concurring op at 5). The support for the concurrence's contention appears to be the section in the Hyatt III opinion that rejected Hall's reading of history that inferred from "the lack of an express sovereign immunity granted to the States and from the Tenth Amendment that the States retained the power in their own courts to deny immunity to other States" (Hyatt III, 587 US 237; Halligan, J. concurring op at 6). I fully accept Hyatt III's proposition that Hall misread the historical record on this point. I also accept that there may be overlap in the historical materials to which courts turn in interpreting the Eleventh Amendment and the sources to which Hyatt III directs. But it simply does not follow (and is a misreading of Hyatt III) that Hyatt III "reject[ed] [the] historical and analytical distinction between interstate and Eleventh Amendment immunity" or in any way implied the two inquiries are indistinguishable (Halligan, J. concurring op at 5-6). It is not an "ahistorical literalism" to say that the Eleventh Amendment is not an immunity: The Eleventh Amendment is an Amendment. The Amendment affirmed and gave constitutional force to aspects of the preexisting immunity of the States, but it is not itself that immunity, and it is a mistake to treat "the written text of the Amendment, and the unwritten doctrines of state sovereign immunity, as one and the same" (William Baude & Steven E. Sachs, The Misunderstood Eleventh Amendment, 169 U Pa L Rev. 609, 611 [2021]). The true ahistorical literalism is the concurrence's assumption that there is "virtue" in "ensuring that a non-state entity will be amenable to suit in both federal and state court" (Halligan, J. concurring op at 5). Again, because Eleventh Amendment "immunity" is not an immunity but rather a disability imposed on federal courts, there is no reason the two doctrines should be aligned, and it is axiomatic that the federal courts are courts of limited jurisdiction, whereas state courts are courts of general jurisdiction, able to hear many cases that federal courts cannot hear. It is not an anomaly for an entity to have no immunity from suit in one jurisdiction and yet be protected from suit in another because the courts of that jurisdiction have been disabled from hearing such suits; rather, the anomaly is to treat New Jersey's relation to New York's courts as equivalent to New Jersey's relation to the federal judicial power in the context of the constitutional design. The underlying action in Hyatt III, like the action at issue here, "involved no federal power at all" (Baude & Sachs at 621). 

Footnote 24: There is a slight difference: all the observed elephant parts were subsets of the elephant. Although Eleventh Amendment "immunity" is an intersecting set with, not a subset of, state sovereign immunity, that distinction does not matter for the purpose of explaining the faults in majority's approach. Indeed, because one is not a subset of the other, it would be as if one of the blind men touched not just a part of the elephant but something else as well.

Footnote 25: See, e.g. Farnell v Bowman (12 App. Cas. 643, 649 [1887] ["(T)he local Governments in the Colonies, as pioneers of improvements, are frequently obliged to embark in undertakings which in other countries are left to private enterprise, such, for instance, as the construction of rail ways, canals and other works for the construction of which it is necessary to employ many inferior officers and workmen. If, therefore, the maxim that 'the king can do no wrong' were applied to Colonial Governments in the way now contended for by the appellants, it would work much greater hardship than it does in England"]).

Footnote 26: I disagree with my concurring colleague's view that scenarios that are unlikely to come to pass are not relevant to test a rule. As one can see, the eminent British scholar A.V. Dicey subscribes to my view. More to the point, though, Hyatt III changed the prevailing law on sovereign immunity, and the question is how to formulate a rule that has a sound theoretical underpinning and does not wreak havoc in the real world. A rule that a state-owned entity is immune from damage cause in another State—no matter how severe or how negligent (let's presume that a State would not intentionally cause harm in another State)—would give States the incentive to enter the commercial arena more broadly than simply by owning transportation companies. Perhaps Michigan should purchase an automobile company and maintain complete immunity from automobile defect lawsuits, or require them to be brought only in Michigan courts. In the real world, we deal with these sorts of issues regularly, because many foreign sovereigns own commercial entities and, as described briefly herein, in the real world we do not consider them immune from suit in our courts for those sorts of activities (see supra at 9-11).

Footnote 27: Chief Judge Wilson's concurrence proposes more broadly to look to the common law and to customary international law, "as Hyatt III directs" (Wilson, Ch. J. concurring op at 9). Hyatt III, however, does not demand any such inquiry. In determining the bounds of interstate sovereign immunity under the Federal Constitution, we are bound not by the Supreme Court's historical analysis or even by its historical method, but only by its statements of law. The statements relevant here were relatively narrow. Hyatt III does not command that states' immunity today encompasses precisely what a historian or a judge might think was conferred by the common law and the law of nations before ratification, as modified by the Constitution. Rather, that case teaches that "States retained immunity from private suits" before ratification, "both in their own courts and in other courts" (Hyatt III, 587 US at 249). Hyatt III leaves open whether other common-law and law-of-nations principles were among those "shared by the States that ratified the Constitution" (id. at 236). Until the Supreme Court instructs that our Constitution requires otherwise, I would refrain from speculating about the contemporary significance of preratification doctrines.

Footnote 28: Chief Judge Wilson's concurrence fails to explain why accessible public transportation is not a "core function" under its test (Wilson, Ch. J. concurring op at 16). Although I do not adopt Chief Judge Wilson's core functions test, in my view, it fails on its own terms here. It appears that the core function test is fundamentally normative. But a judge is not in a better position than a duly-elected legislature to choose for its population what are its government's core functions. To illustrate the difference between the Chief Judge's and my positions, in my view, a state can determine its essential functions. It is then the judiciary's role to determine whether that state has sufficient control over a public entity that exercises its governmental functions such that the entity has structurally become an arm of the state.

Footnote 29: Chief Judge Wilson's concurrence posits that my approach "looks to New Jersey law to inform the determination of the reach of its state sovereignty" (Wilson, Ch. J. concurring op at 11 n 3). To clarify, as I have explained above, "The State's intent that a public entity should be regarded as an arm of the State informs the analysis and is entitled to certain deference, but the State cannot expand the boundaries of its sovereignty by pronouncement alone" (supra at 5). Thus, the Chief Judge and I agree that a state cannot unilaterally cloak an entity with the protection of sovereign immunity. In my view, structurally, the entity must actually be an arm of the state, as evidenced by my analysis of multiple factors here.

Footnote 30: The New Jersey State auditor "is a constitutional officer appointed by the Legislature," and the Office of the State Auditor is located within New Jersey's legislative branch (Office of the State Auditor, New Jersey Legislature, https://www.njleg.state.nj.us/audit-reports [accessed Oct. 1, 2024]).

Footnote 31: Judge Halligan's concurrence argues that, in a state sovereign immunity analysis, "concern for state solvency plainly must be relevant given that any significant impact on a State's finances will hinder its ability to serve the basic needs of the polity" (Halligan, J. concurring op at 5 n 2). But this has no limiting principle. Any damages that the State must pay could interfere with the State's ability to pay for other services. After all, a State has budgetary constraints. Thus, under the concurrence's view, when the state is liable for judgments against a public entity, there is always an intrusion on state sovereignty, making this in practice a one-step test.

Footnote 32: Plaintiffs' claim that the New Jersey Tort Claims Act is an express waiver of immunity is wrong on the merits. That statute applies to claims filed in New Jersey's state courts and does not limit NJT's interstate sovereign immunity defense.